Argued Oct. 17, decided Oct. 24; rehearing denied Dec. 26, 1911.

## SABIN *v.* PHOENIX STONE CO.
### (HEGELE *et al.,* INTERVENERS.)

[118 Pac. 494: 119 Pac. 724.]

ESCROWS—REVOCATION OF AGREEMENT—SUBSEQUENT AGREEMENT
    BETWEEN PARTIES.
    1. Defendant stone company agreed with interveners to purchase their stone quarry, the price to be $30,624 in cash, notes, and stock, deeds

to be deposited in escrow with defendant trust company, also a party to the agreement, for delivery when the notes were paid, but that on default, the sale to be off and the deeds and notes returned to the respective makers. The stone company could not pay the notes when due, and, on January 23d, made an offer, which interveners accepted, to pay $28,500 in full settlement, payable $10,500 in cash, and $18,000 in bonds of a proposed issue by the stone company. At the same time, the stone company adopted a resolution, authorizing payment of $10,500 to interveners out of the proceeds of the bonds, and the delivery to them of the $18,000 in bonds upon delivery to the stone company of all the instruments held in escrow, and providing that until such amount was paid to interveners no bonds should be sold, except on condition that the price might be refunded if the $10,500 was not realized by a certain date. The stone company could not raise the $10,500 in time, but the trust company, assuming that the accepted offer of January 23d terminated the escrow agreement, without interveners' knowledge, delivered the deeds to the stone company, surrendered the notes, and took a mortgage from the stone company, and recorded it and the deeds, and loaned to it $10,000, secured by $17,000 of the bonds issued. Interveners accepted the $10,000 and the $18,000 in bonds, not knowing the source of the money. Four thousand dollars of the pledged bonds were sold, and, by applying the proceeds and other payments, the note held by the trust company was reduced to $4,197. The trust company foreclosed its pledge and bought in the bonds. Under a provision in the mortgage, a new trustee was substituted for the trust company, and suit was brought to foreclose the mortgage, in which the trust company answered, setting up its ownership of $13,000 of the bonds. Interveners came in and charged conspiracy by the trust company to prevent them from realizing the full price of the quarry, and prayed that the trust company's bonds be canceled. *Held,* that the trust company was bound not to surrender interveners' deeds without authority; that the escrow agreement was not canceled by the acceptance of the offer of January 23d, so as to authorize such surrender, since the $10,000 had not then been paid, nor the $18,000 in bonds delivered to interveners, and also because the trust company was not a party to the offer and acceptance.

ESCROWS—DELIVERY BY DEPOSITARY—CONCURRENT CONDITIONS.

2. Even if the offer and acceptance of January 23d did cancel the escrow agreement, the trust company, as the escrow holder, would be bound to return the deed to interveners, so that their interest in the land would not be affected by the cancellation.

ESCROWS—WRONGFUL DELIVERY—EFFECT.

3. Since the offer and acceptance of January 23d did not in fact cancel the escrow agreement, the trust company abused its relation as escrow holder by taking the $17,000 in bonds as a pledge for its loan, without interveners' knowledge, and by buying in the $13,000 of pledged bonds on foreclosure of the pledge, thereby impairing the security of interveners' bonds, so that interveners were entitled to have the $13,000 of bonds canceled; but the trust company should be allowed the money advanced to the stone company of which interveners had the benefit; and, since the stone company's notes representing it had been reduced

to $4,197, the trust company should share with them *pro rata,* to that extent, in the proceeds of the mortgage foreclosure sale; the $4,197 to be considered as if it were a bond equal in validity to interveners' bonds.

JUDGMENT—PERSONS BOUND.

4. A decree for plaintiff, in a suit to foreclose a pledge of corporate bonds, would not give him title to such bonds as against others having an interest therein, who were not parties to such suit.

ESTOPPEL—ESTOPPEL BY CONDUCT.

5. Since an estoppel only applies to parties and privies, the execution of the offer and acceptance of the agreement of January 23d, to which the trust company was not a party, and interveners' acceptance of the $10,500 payment thereunder, and of the bonds, did not estop them from seeking to enforce payment of such bonds and having those issued to the company canceled; it being also necessary that any plea of estoppel, based on the theory that the agreement of January 23d abrogated the escrow agreement, should show that the trust company returned the escrow deed to interveners before itself purchasing the bond.

ESTOPPEL—PLEADING.

6. Since an estoppel is designed to prevent the truth from being shown, a plea of estoppel must be framed to a certain intent in every particular.

ESCROWS—EFFECT OF RELATION.

7. A trust company, with which deeds for a stone quarry were deposited under an agreement executed by the trust company, the grantor and grantee, whereby the trust company agreed to hold the deeds in escrow for delivery to the grantee when the purchase-money notes were paid, occupied a fiduciary relation toward the grantor, enjoining upon it the strictest fidelity, and it violated such obligation by delivering the deeds before payment so as to impair the ability of the grantee to meet its obligation to complete the purchase under the contract.

ESCROWS—WRONGFUL DELIVERY—RATIFICATION.

8. Defendant stone company agreed with interveners to purchase their stone quarry, the price to be $30,624 in cash, notes, and stock, deeds to be deposited in escrow with defendant trust company, also a party to the agreement, for delivery when the notes were paid, but on default the sale to be off, and the deeds and notes returned to their respective makers. The stone company could not pay the notes when due, and on January 23d made an offer, which interveners accepted to pay $28,500 in full settlement, payable $10,500 in cash, and $18,000 in bonds of a proposed issue by the stone company. At the same time the stone company adopted a resolution authorizing payment of $10,500 to interveners out of the proceeds of the bonds, and the delivery to them of the $18,000 in bonds upon delivery to the stone company of all the instruments held in escrow, and providing that, until such amount was paid to interveners, no bonds should be sold, except on condition that the price might be refunded if the $10,500 was not realized by a certain date. The stone company could not raise the $10,500 in time, but the trust company, assuming that the accepted offer of January 23d terminated the escrow agreement, without interveners' knowledge, delivered the deeds

to the stone company, surrendered the notes, and took a mortgage from the stone company, and recorded it and the deeds, and loaned to it $10,000 secured by $17,000 of the bonds issued. Interveners accepted the $10,000 and the $18,000 in bonds, not knowing the source of the money. Four thousand dollars of the pledged bonds were sold, and, by applying the proceeds, and other payments, the note held by the trust company was reduced to $4,197. The trust company foreclosed its pledge and bought in the bonds. Under a provision in the mortgage, a new trustee was substituted for the trust company, and suit was brought to foreclose the mortgage, in which the trust company answered, setting up its ownership of $13,000 of the bonds. Interveners came in and charged conspiracy by the trust company to prevent them from realizing the full price of the quarry, and prayed that the trust company's bonds be canceled. *Held*, that interveners accepted no benefit from the trust company in the transaction so as to require them to also assume the burdens of the changed conditions caused by the trust company delivering the escrow deeds.

CORPORATIONS—MORTGAGES—FORECLOSURE—PROCEEDS—DISPOSITION.

9. The fact that interveners purchased $2,500 worth of the stone company's bonds at 90 would not require that they should share in the proceeds of the mortgage foreclosure sale on that basis, in view of the fiduciary relation which existed between the trust company and interveners, as interveners were entitled to go into the open market and buy the bonds as cheaply as possible.

CORPORATIONS—MORTGAGES—FORECLOSURE—PROCEEDS—DISPOSITION.

10. The trust company would be entitled to share *pro rata* with interveners and other bondholders in the proceeds of the mortgage foreclosure sale to the extent of the $4,197 advanced by the trust company for interveners' benefit, but payment of the remaining $13,000 of the bonds held by it should be postponed until the rest of the bonded debt is paid.

From Douglas: JAMES W. HAMILTON, Judge.

Statement by MR. JUSTICE BURNETT.

This is an action by R. L. Sabin, plaintiff and respondent, against the Phoenix Stone Company, a corporation, E. G. Young, A. S. Young, J. C. Young and George J. Stearns, partners as E. G. Young & Co. and F. E. Smith, defendants and respondents; the Portland Trust Company of Oregon, a corporation, defendant and appellant; Charles Hegele and D. W. Riedle, intervenors and respondents.

For convenience the principal defendant will be called the stone company, the defendant Portland Trust Com-

pany of Oregon will be called the trust company, and Charles Hegele and D. W. Riedle will be called the interveners. Prior to February 1, 1907, the interveners were the owners of and in possession of a certain stone quarry property and business situated in Douglas County, Oregon. The stone company was organized for the purpose of taking over and operating this property. As a step in that direction, the stone company and the interveners executed an agreement that the purchase price of the property should be $30,624.69, payable part cash, some in notes, and some in shares of the stock of the company; that in consideration thereof the interveners should execute and deposit with the trust company their warranty deed and bills of sale to the stone company for the quarry property, and for sundry contracts and personal property, and that the deed and other instruments of writing should be deposited in escrow with the trust company, upon the conditions that upon payment of the promissory notes the same should be canceled and delivered up to the makers, and the deed and bills of sale should be delivered by the trust company to the stone company; but, if default was made in payment of the notes by April 1, 1908, the agreement for the sale should be canceled, the deeds returned to the interveners, and the notes to the maker, the stone company. This escrow agreement was executed, on behalf of the stone company, by E. W. Barnes, its president, and B. Lee Paget, its secretary, and on behalf of the trust company by B. Lee Paget, its secretary; he having that position in both companies. It was also signed by the interveners, thus making it a tripartite agreement. As otherwise agreed, the stone company operated the quarry, but as the time approached for payment of the purchase price, as evidenced by the notes, it seemed certain that it could not raise the money to discharge its obligations according to

the escrow agreement. In consequence of this, on January 23, 1908, the stone company made this proposition in writing to the interveners:

"Portland, Oregon, January 23, 1908. The Phœnix Stone Company hereby proposes and agrees to pay to Messrs. Riedle and Hegele the sum of $28,500.00 as payment and settlement in full for all demands, including all outstanding notes with interest to April 1, 1908, and 2,000 shares of the company's stock, upon the following terms, to wit: $10,500.00 cash on or before April 1, 1908, and $18,000.00 in first mortgage six per cent bonds of a proposed issue of $40,000.00 on all the property and equipment of the company.

"Phœnix Stone Company [Seal]
"By E. W. Barnes, President.
"By B. Lee Paget, Secretary."

At the foot of this writing are subscribed the words:

"Accepted: Charles Hegele, D. W. Riedle.
"Witnesses: Thomes F. Baylis, W. P. Benedict."

When this writing was executed, the intervener D. W. Riedle was one of the directors of the stone company and participated in its deliberations about floating the bonds now to be mentioned. At this time the company resolved to issue $40,000 in bonds, to be secured by a mortgage to the trust company as trustee, to be used in part in carrying out the offer and acceptance above quoted. Among other things, the mortgage given to secure these bonds contained a provision to the effect that on the motion of a majority of the bondholders, the trustee could be removed and another appointed. In pursuance of this provision, the interveners, having acquired a majority of the bonds, removed the trust company as trustee, and appointed in its stead the plaintiff, R. L. Sabin, which accounts for his being plaintiff in this suit to foreclose the mortgage, instead of the trust company. In connection with the above-quoted offer and acceptance, which will be in this opinion hereafter so styled, the stone company, by its board of directors, adopted on that date the folowing resolution:

"Be it resolved, that the president and secretary be, and they are hereby authorized, as soon as they have realized on the sale of bonds the sum of $10,500.00 cash, to pay such sum of $10,500.00 to Charles Hegele and D. W. Riedle and deliver to Mr. Hegele and Mr. Riedle $18,000.00 in par value of the bonds above authorized, upon the release, surrender and delivery to the company of all the instruments now held by the Portland Trust Company of Oregon in escrow between this company and the said Charles Hegele and D. W. Riedle and the transfer to the company of the shares of stock purchased by said Hegele and Riedle from R. A. Eva and the execution of a proper release of all claims and demands of the said Hegele and Riedle against the company then existing; and be it further resolved, that until said $10,500.00 cash shall have been realized and such settlement made with Mr. Hegele and Mr. Riedle, no bonds shall be sold except on the condition that the money received therefor may be refunded and the return of said bonds demanded in case of failure to realize said $10,500.00 by sale of the bonds on or before April 1, 1908."

As the time approached for making the payment demanded by the escrow agreement, the stone company found itself unable to actually sell enough bonds to raise the $10,500 required by the offer and acceptance. At this juncture, the trust company assumed to consider the offer and acceptance as an abrogation of the escrow agreement, and, acting with the directors of the stone company, except the intervener Riedle, who was also a director, and with their knowledge and assent, but without notice to either of the interveners, and without their knowledge or assent, delivered the deed from the interveners to the stone company, surrendered the notes of the stone company held in escrow, took the mortgage named in the complaint, recorded it and the deed, and loaned to the stone company, through its secretary, Baylis, $10,000, taking as security in pledge therefor $17,000 of the bonds provided for in the mortgage. The fact that the loan was made on these bonds as a pledge was kept secret from the

interveners until after the deed had been surrendered, and it and the mortgage recorded. Yielding to the importunities and persuasions of the president of the trust company, the interveners accepted this $10,000, together with $500 otherwise raised by the stone company, and the $18,000 in bonds; all the time being ignorant of the fact that the $10,000 had been raised upon a pledge of the $17,000 in bonds. Afterwards these pledged bonds were sold in part, so that they were reduced to $13,000, and the proceeds from such sales and payments from other sources reduced the note to $4,197.45, on July 21, 1909. Becoming dissatisfied with the trust company as trustee, the interveners caused its removal, as aforesaid, and directed the new trustee to commence suit to foreclose the mortgage for the payment of their bonds, amounting to $20,500, and $6,500 of bonds held by other parties, about which there is no question, making $27,000 in all.

For the purposes of this decision, the answers of the other defendants or lienholders are not material at this juncture. The defendant trust company answered, and after some denials set up, in substance, that it took the $13,000 remaining on hand of the bonds for collateral security for the $10,000 loaned to the defendant stone company, through its secretary, Baylis; that it had brought suit to foreclose its pledge, and sought to apply the proceeds of a sale of the $13,000 bonds, not only to the payment of the Baylis note, but to other indebtedness of the defendant stone company owing to the trust company, and that at the sale upon the decree ensuing it had purchased the $13,000 of bonds remaining, and was then the owner and holder thereof. The interveners then filed their complaint in intervention, charging, in substance, that, having entered into the escrow agreement mentioned, the defendant trust company and the officers of the defendant stone company had formed a conspiracy to

Sig. 13

defraud the interveners, and to so manipulate the bond transaction as to deprive them of their property in the stone quarry, and to prevent them from realizing the full purchase price thereof. · The burden of their prayer was that the $13,000 bonds should be canceled and held for naught in the hands of the defendant trust company. Answering the complaint in intervention, the trust company, after certain denials, attempted to plead that the interveners, having accepted the $10,500 cash and $18,000 in bonds under the offer and acceptance, and not having returned either the cash or bonds to the stone company, but, on the contrary, are seeking to have the mortgage foreclosed to pay these very bonds, are estopped to make the allegations of the intervention complaint. The trust company also, in this answer, deraigned title to the $13,000 of bonds by virtue of purchase at the sale on foreclosure of the pledge, as before mentioned. The new matter of the trust company's answer to this complaint was traversed by the interveners. The substance of the decree of the court below was to cancel these bonds and foreclose the mortgage for the payment of the remaining $27,000 of the $40,000 issue authorized by the mortgage in the first instance. The trust company appeals from that decree.        Modified.

For appellant there was a brief over the names of *Messrs. Teal, Minor & Winfree* and *Mr. W. A. Johnson,* with an oral argument by *Mr. Wirt Minor.*

For plaintiff and interveners there was a brief over the names of *Messrs. Bauer & Greene,* with an oral argument by *Mr. Thomas G. Greene.*          ·

For respondents, the Phœnix Stone Company, there was a brief over the names of *Messrs. Veazie & Veazie,* with an oral argument by *Mr. Arthur L. Veazie.*

Mr. Justice Burnett delivered the opinion of the court.

The question to be determined upon this appeal is whether or not the $13,000 of the bonds mentioned are

valid in the hands of the trust company, as against the interveners here. In effect, the trust company, by its custody of the interveners' deed to the land in escrow, held the land itself in trust, for the time being, according to the terms of the escrow agreement. The transaction amounted to an option agreement for the sale of the real property in question, to be effected or not according to whether the notes mentioned were paid and the other conditions were performed or not. Under these circumstances, it was the duty of the trust company to act with the utmost candor and fairness toward the interveners, and not to part with their property, or, what was substantially the same thing, surrender their deed, without actual authority from them to do so. Above all, in equity and good conscience, it could not so manipulate the transaction as to impair or lessen the security for the payment of the purchase price of the land as against its clients, the interveners, or so as to gain over them an advantage for itself.

1, 2. It is contended, however, on behalf of the trust company, that the offer of the stone company made January 23, 1908, and above quoted, constituted a new contract, which supersedes and nullifies the escrow agreement under which the trust company held the deed of the interveners, and hence justified the trust company in delivering the deed to the grantee, and released it from any obligation to the interveners. This position is fallacious and unsound for three reasons: First, the offer and acceptance of January 23, 1908, was still executory when the trust company delivered the deed, and could not amount to payment of the purchase price of the land, so as to release the deed from escrow, until the $10,000 was actually paid and the $18,000 of bonds were actually delivered; second, although the trust company was a party to the escrow agreement, yet it was no party to the offer

and acceptance, and could not be affected by the latter; and, third, if the offer and acceptance had the effect to cancel the escrow agreement, it would carry with it the return of the deed to the interveners, so that it would not operate to affect their estate in the land.

3. We conclude, therefore, that the offer and acceptance did not of itself affect the duties and liabilities of the trust company under the escrow agreement. Under these circumstances, the trust company, occupying the fiduciary relation that it did to the interveners under the escrow agreement, could not so operate as to gain an advantage to itself over them. The conditions of the resolution passed with reference to the bonds were that they were to be sold, and that until said $10,500 cash had been realized, and such settlement made with Mr. Hegele and Mr. Riedle, no bonds should be sold, except on the condition that the money received therefor should be refunded and the return of the bonds demanded, in case of failure to realize $10,500 by sale of the bonds on or before April 1, 1908. The trust company was conversant with these conditions. The interveners had a right to rely upon their being performed and actual sales made. The clear weight of the testimony shows that at the time they took the $10,500 cash and $18,000 bonds, the interveners did not know that the trust company had assumed to take $17,000 of the bonds as a pledge to secure the payment of the $10,000. It is contended for the trust company that they must have known it, or ought to have known it, or at least, by the exercise of reasonable diligence and prudence, might have discovered it. This contention would be well enough if the interveners and the trust company had been dealing with each other as adversaries, or on equal terms; but they were not. The trust company occupied a fiduciary relation to the interveners. It cannot escape its duty by saying what they must have known, or ought to

have known, or might have known. The interveners were entitled to rely upon their trustee for fair dealing and the absence of any action of the trust company hostile to them or favorable to its own interests as against those of the interveners.

Neither is it a question of what the stone company had a right to do with its own bonds. The question is, What right had the trustee to accept those bonds as a pledge, in such a way as to operate against the interest of the interveners, when it was bound in equity to protect that interest? It is manifest that the action of the trust company in taking $17,000 of the bonds as a pledge for repayment to it of $10,000 loaned to Baylis for the stone company, and finally buying in $13,000 of them at a sale to foreclose the pledge for the balance then due, was inimical to the interest of the interveners; for, by as much as the proceeds of a sale under foreclosure of the mortgage to secure the bonds would have to be applied to the pledged bonds, by so much would the fund applicable to the payment of the interveners' bonds be diminished, and their security lessened. The essence of the trust company's fault as a trustee is that it used its position to speculate on the securities, so as to get them at about 50 per cent of their face value, while the interveners were paying 100 per cent. This could not have been accomplished, unless the trust company had abused the confidence of the interveners by surrendering their deed without authority, and in violation of the escrow agreement.

4. The decree in the suit by the trust company to foreclose the pledge of the $13,000 bonds does not improve its title to those bonds as against the interveners, for the latter were not parties to that suit, and can be in no way affected by it.

5. It remains to consider the plea of estoppel urged by the trust company. In that connection it is alleged, in substance, that the original escrow agreement was merged in the offer and acceptance, and terminated by the mutual consent of the stone company and the interveners; that the offer and acceptance became and was the only agreement between the interveners and the stone company touching any of the property mentioned in the complaint in intervention; that the latter agreement was performed by the payment by the stone company of $10,500 cash and $18,000 in bonds; and that the interveners had not returned either the cash or bonds to the stone company, but are seeking in this suit to foreclose the mortgage and force the payment of the bonds, and in the language of the plea, they are "still seeking to enforce the payment of the said bonds and the foreclosure of said mortgage or deed of trust long after they had known and been familiar with all the facts and circumstances and with all the representations and statements made at and prior to and subsequent to the acceptance of said cash and of said bonds by the interveners." In our judgment, the trust company can take nothing by this plea of estoppel. It hinges upon the effort of the offer and acceptance. The trust company, not being a party to that arrangement, is not affected by it in its character as holder of the escrow deed, and can claim nothing under the offer and acceptance in its own behalf. It is elementary law that an estoppel applies only to parties and privies. *Falls City Lumber Company* v. *Watkins,* 53 Or. 212 (99 Pac. 884). Not being in privity with the stone company, it can make no difference to the trustee whether the interveners returned the money to the stone company or not.

6. Moreover, the offer and acceptance does not in any way refer to the escrow agreement, and cannot be held to abolish or terminate it. In order to reach the conclusion

of law set up in this plea of estoppel, to the effect that the escrow agreement was abrogated by the offer and acceptance, the trust company should have pleaded all the facts surrounding that transaction, among which, to be effectual, would have been, if it were a fact, the surrender of the deed to the interveners and the notes to the stone company. This would have indicated that the trust company had done equity by returning the deed of the interveners, thus restoring them to their former position, before going into the bond market to its own advantage, and in a manner detrimental to their *cestui que trust*. In the situation disclosed, it does not lie in the mouth of the trust company to set up the odious plea of estoppel. If the facts had been stated thus, a court might have reached the conclusion that the original agreement was abolished by the mutual consent of the stone company and the interveners; but until they do appear we cannot, as a matter of law, say that the original agreement in escrow was abolished. The design of an estoppel is to prevent the adverse party from alleging even the truth, and to have this drastic effect it is a rule that the plea must be formulated with great certainty, even to a certain intent, in every particular. The plea in question is really subject to a general demurrer, and cannot avail the trust company in this suit.

For the reason that its acceptance of the $17,000 of bonds as a pledge for the money loaned to the stone company was prejudicial to the interest of the interveners, as *cestui que trust,* the trust company cannot be protected in that transaction to the prejudice of the interveners. It is entitled, however, to be reimbursed for money advanced, so far as it operated to the advantage of the interveners. It would be inequitable to mulct the trust company in the unpaid portion of its money that actually went to the benefit of the interveners. Enabled as we are by the

testimony to trace the transaction accurately, the court is authorized to protect the trust company, so far as it acted in harmony with the interests of the interveners, but no farther. Bearing in mind that $10,000 of the cash received by the interveners was advanced by the trust company on the note of Baylis, we glean from the testimony, and especially from the copy of the note and the indorsements thereon received in evidence, that by sundry payments of principal and interest that note was reduced to $4,197.45, with interest from July 1, 1909, at 6 per cent per annum; that rate having been agreed upon by the makers and the trust company after the note had run to June 5, 1909. The interveners having received the benefit of the money, of which this balance is unpaid, they must be held to allow the trust company to share *pro rata,* to that extent, with them in the proceeds of the foreclosure sale in this suit. In other words, the trust company should stand in this suit as if it had a bond of $4.197.45, with interest thereon, as aforesaid, equal in validity to those bonds belonging to the interveners. No one questions the bonds held by H. C. Leonard of $5,000, Mrs. J. E. Hall, $1,000, and the Commercial Bank of Oakland, $500; so they should also rank with the bonds of the interveners.

We conclude upon the whole case that, as against the interveners and the other bondholders mentioned, the $13,000 of bonds in possession of the trust company, numbered 55 to 80, both inclusive, should be held for naught, without prejudice to any cause of suit the trust company may have against the stone company to enforce payment of the same, and except, also, as to the amount of $4,197.45, with interest at 6 per cent per annum since July 21, 1909, as above mentioned, and that with this modification the decree of the court below should be affirmed, without either party recovering costs or disbursements from the other.                    MODIFIED.

Decided December 26, 1911.

## ON PETITION FOR REHEARING.

[119 Pac. 724.]

MR. JUSTICE BURNETT delivered the opinion of the court.

7. In its petition for a rehearing the Portland Trust Company of Oregon seems to proceed upon the theory that in the transaction in question it and the interveners and the Stone Company were all dealing at arms' length as to each other. It may be conceded that this is true as between the Stone Company and the interveners, and as between the Stone Company and the Trust Company. This, however, is not the case as between the Trust Company and the interveners. As to the latter, the Trust Company occupied a fiduciary relation entailing upon it the strictest fidelity to the interveners, who were, in fact, for the time being its *cestius que trustent.*

8. It is contended in the petition for rehearing that the interveners accepted the benefits of the transaction named, and that they must be bound by its burdens or by the changed conditions brought about by the act of the Trust Company in delivering the escrow deed. The answer to that proposition is that the interveners accepted nothing from the Trust Company. What they received they had from the Stone Company. As between the interveners and the Trust Company, the escrow agreement was the standard of conduct to be observed. By operation of law one condition of that contract was that the latter should not act under it to the disadvantage of the former. Any act, therefore, of the Trust Company amounting to an impairment in any degree of the ability of the Stone Company to meet its obligations to the interveners, would be a violation in effect at least of the fiduciary obligations resting upon the Trust Company in respect to the interveners. The delivery of the deed left with the Trust Company in escrow rendered it possible for that company

to acquire $17,000 of the bonds of the Stone Company for the sum of $10,000, and this was one of the results flowing from the transaction. The difference between those two amounts virtually represented a premium paid by the Stone Company for the use of the $10,000. The payment of, or liability to pay, so large a premium as a result of the pledging transaction by that much, diminished the ability of the Stone Company to pay the interveners the obligation due to them. In this we think that the Trust Company was at fault, and equity will so mould the conduct of the parties as to make it comply with the standard prescribed by their own stipulations.

9. It is also contended, in substance, that, because the interveners may have bought $2,500 of the bonds of the Stone Company at 90 per cent, they should share in the proceeds of sale on that basis if the Trust Company is itself held to account for the difference between $10,000 and $17,000 the face of the bonds, or is to be relegated to a junior incumbrancer's place. This would be true probably except for the fiduciary relations between the Trust Company and the interveners already noted. The latter, however, owed no such duty to the Trust Company, and they were privileged to go into the open market and buy the bonds as cheaply as they could. And so with the Trust Company as against the Stone Company, but not as against the interveners on account of the trust relation existing. We do not feel called upon to analyze the transaction beyond its consummation in the loan of the $10,000. If afterwards the Trust Company chose to loan money to the Stone Company, it was no concern of the interveners.

10. We think, perhaps, that the conclusion on the former opinion was not as clearly stated as might be, and so we recast the matter in this way. As respects the bonds only without reference to other liens either prior

or junior, the mortgage securing the bonds should be foreclosed, and the property sold in the manner provided by law. The proceeds of this sale should be applied *pro rata* to the payment of the bonds held by H. C. Leonard in the sum of $5,000, Mrs. J. E. Hall $1,000, the Commercial Bank of Oakland $500, the interveners $20,500, and the Trust Company in the sum of $4,197.45; but the remainder of the $13,000 of the bonds held by the Trust Company should be postponed to a second place in relation to the residue of the bonded debt already noted and paid only after such residue is satisfied.

With this modification, the decree of the court below is affirmed as stated in the former opinion.

Rehearing denied.      MODIFIED: REHEARING DENIED.