Argued April 6, affirmed May 23, 1916.

## VERRELL v. FIRST NAT. BANK.

(157 Pac. 813.)

**Banks and Banking—Action for Deposit—Defenses.**

1. That a national bank cannot act as a broker, so that an arrangement with it that it shall do so is illegal, is not available as a defense to the bank sued by a depositor, where its president misappropriated the money to his own use without the depositor's knowledge or consent; this not being within the attempted grant of authority to the bank to loan.

**Banks and Banking—Liability for Acts of Officers.**

2. A bank is liable to a depositor for the misappropriation of funds by its president to his own use.

[As to liability of banks for fraud of officers, see note in 39 Am. Rep. 760.]

**Account Stated—Bank and Depositor.**

3. An account stated may result from a bank writing up and delivering a pass-book to a depositor, if he fails to object in a reasonable time.

**Account Stated—Failure to Object—Fraud.**

4. One is not precluded from disputing an account as stated because of his failure to object, if his failure was induced by fraud of the other party.

**Account Stated—Surcharging and Falsifying.**

5. An account stated may be impeached for fraud, error or mistake.

**Estoppel—To Whom Available.**

6. Only those to whom a representation is made or their privies can take advantage of it as an estoppel, and so not a bank upon a mere representation of a national bank examiner by a letter, he not being an agent or officer of the bank.

**Estoppel—Fraud of Party Claiming.**

7. A bank cannot assert an estoppel against a depositor on his certificate obtained by fraud of its president.

**Appeal and Error—Harmless Error—Remarks of Judge—Instructions.**

8. Any possibility of prejudice from remarks of the court as appearing to decide any question of fact was removed by his charge that the jury were the exclusive judges of the fact, and that, if they had received any impressions from him as to what the facts are, it was their duty to disregard them and find the facts as they find without being influenced in any way by the court.

From Douglas: JAMES W. HAMILTON, Judge.

In Banc.   Statement by MR. JUSTICE HARRIS.

This action is prosecuted by Laura M. Verrell for the purpose of recovering $5,000, which she deposited with the First National Bank of Roseburg. The verdict of the jury was for the plaintiff, and the defendant appealed from the resultant judgment. The complaint alleges that the plaintiff had deposited funds with the defendant from time to time until April 4, 1911, when her deposit amounted to $6,593.89; that since that date the bank has paid to her and transferred to her account with the Douglas National Bank $1,593.89, leaving a balance of $5,000 which the bank owes and refuses to pay. The answer denies any liability. The defendant avers that:

"T. R. Sheridan was the duly appointed and acting agent of the plaintiff for loaning the money on deposit with the defendant bank, and for that purpose was duly authorized to withdraw the funds of the plaintiff from the defendant bank, and did during said time withdraw the funds of the plaintiff and loan them and collect the same and reloan them, all with the knowledge and upon the authority of the plaintiff."

It is further alleged that statements were rendered to the plaintiff showing the condition of her account, and that her failure to object to these statements produced an account stated.

The answer also recites that R. W. Goodhart, a national bank examiner, wrote a letter to the plaintiff, and that she answered the letter. The letter and the answer read thus:

"Roseburg, Oregon, June 20, 1911.
"Laura M. Verrell, City.

"Dear Madam: The records of this bank showed, at a recent examination, that certain charges had been made in your account by President Sheridan. In other words, part of your deposit had been withdrawn and loaned by him. Mr. Sheridan states that you authorized him to withdraw these funds and invest them for you. If this is so, kindly sign the certificate at the bottom of this letter and return in the inclosed envelope. Mr. Sheridan informs me that he has withdrawn the following sums which he loaned to the parties mentioned below: $5,000.00 loaned to T. R. Sheridan.        Yours respectfully,

"R. W. GOODHART,
"National Bank Examiner."

"I hereby certify that any sums withdrawn by Mr. T. R. Sheridan from my balance on deposit with the First National Bank of Roseburg, Oregon, were duly authorized by me, and the First National Bank is relieved from all liability relative to the same.

"LAURA M. VERRELL."

The defendant alleges that it relied upon the letter and answer; that T. R. Sheridan has since become bankrupt and that plaintiff is therefore estopped to assert that the bank has any of her funds.

After denying that T. R. Sheridan acted as her agent, the plaintiff replied by alleging that he was the president and chief executive officer of the bank and managed its affairs; that plaintiff transacted her busi-

ness with the defendant through Sheridan as such president and representative; that the plaintiff authorized "the said bank to lend a portion of her funds, and this was done upon the express understanding that said bank would find safe loans, upon good security, and collect the principal and interest for plaintiff's benefit, but plaintiff never waived, but reserved, the right to sanction any such loan before making; that plaintiff never authorized said bank to lend any money to said T. R. Sheridan, and never knew that it was claimed that said Sheridan had received any of plaintiff's funds as a loan or otherwise until the year 1913." The plaintiff further alleges that she "never intended at any time to authorize the lending of any of her funds to said Sheridan," but Sheridan, as president of the bank, agreed that the bank would find good loans for the plaintiff.

The reply explains the Goodhart letter and answer by averring that T. R. Sheridan, as president of the bank, informed plaintiff that she would receive from the bank examiner a statement to be signed by her acknowledging that she had authorized the lending of certain funds by the bank; that Sheridan falsely represented to her that the signing of such statement would only be a matter of form, and directed her to sign and return the statement to Goodhart; that she had confidence in Sheridan, and on that account signed the statement without carefully reading it, supposing that she was executing a mere formality, and without knowing that it set forth that her money had been loaned to Sheridan; that she did not then know, as she has since learned, that the bank was in an unsound condition, and Sheridan verging on bankruptcy.

The reply combats the defense of account stated by alleging that the plaintiff never received any state-

ments of her account except a bank pass-book show-ing a charge ''under date of April 15, 1911, with $5,000, which was understood by plaintiff to represent a loan or loans made by said bank, through its presi-dent, T. R. Sheridan, for plaintiff's account, on good security, according to arrangements hereinbefore men-tioned, and plaintiff at all times looked to said bank to collect said sum, with interest, and return it to plaintiff's account.''                    AFFIRMED.

For appellant there was a brief and an oral argu-ment by *Mr. Oliver P. Coshow.*

For respondent there was a brief and an oral argu-ment by *Mr. Benjamin L. Eddy.*

MR. JUSTICE HARRIS delivered the opinion of the court.

The First National Bank of Roseburg received a charter in 1901, and it continued to transact an active banking business until June 17, 1911, when it closed its doors to new business and transferred deposits held by it, together with certain of its assets, to the Douglas National Bank of Roseburg. During the entire period of its existence T. R. Sheridan was president of the First National Bank; he was more than a nominal offi-cer; he stood behind the bank counter and transacted business with customers, and he controlled the bank. The plaintiff had implicit confidence in him, and appar-ently she regarded Sheridan as the bank.

It is conceded that on April 4, 1911, Laura M. Verrell had on deposit in the First National Bank the sum of $6,593.89, and it is admitted that the defendant either paid to her or transferred to the Douglas National Bank for her $1,593.89, and that the remaining $5,000

was withdrawn by Sheridan on April 15, 1911, and used by him in his own business.  The plaintiff asserts that the bank is liable to her for the money withdrawn by Sheridan, while the defendant argues that it is absolved from liability because: (1) The plaintiff made Sheridan her agent and authorized him to loan the money to himself; (2) there was an account stated; and (3) the Goodhart letter and answer and her failure to object to the statements showing the condition of her account with the bank work an estoppel.  The plaintiff assails the defenses interposed by the bank by contending that she transacted the business with Sheridan as the president of the bank, and through him authorized the defendant to find borrowers for her, and that she did not authorize Sheridan, as an individual, to loan her money; that she answered the Goodhart letter under the direction of Sheridan, as president of the bank, and because of misrepresentations made by him; that the statements rendered to her did not show that the money had been loaned to Sheridan, and she did not know until 1913 that he had used the funds; and that the true situation prevents an estoppel.

1, 2.  The plaintiff says that she did not authorize Sheridan, as an individual, to loan or borrow her money, but that she did empower the bank to make loans upon good security, reserving to herself the right to sanction "any such loan before making."  A national bank cannot act as a broker (*Byron* v. *First Nat. Bank,* 75 Or. 296, 299 (146 Pac. 516); and the defendant therefore insists that the arrangement pleaded by the plaintiff would not bind the bank, because it was *ultra vires* and illegal.  If it be assumed, however, that it was entirely legal for the plaintiff to authorize the bank to loan her funds, no one could successfully

contend that the bank would be exculpated by proving that its president appropriated the money to his own use without the knowledge or permission of the depositor, for the reason that the act of the president would not be within the limits of the granted power. Authority to the bank to make loans would not relieve it from liability, if its president misappropriated the money. A misappropriation by the president is not a loan by the bank, and consequently the illegality of the granted authority would not shield the defendant if the act done was beyond the authority actually conferred. The theory of the plaintiff is that Sheridan misappropriated the money to his own use without her knowledge or consent. If he did, the bank must answer for the delinquency of its officer and representative: *First Nat. Bank* v. *Peck*, 180 Ind. 649 (103 N. E. 643); *First Nat. Bank* v. *Anderson*, 172 U. S. 573 (43 L. Ed. 558, 19 Sup. Ct. Rep. 284); *Chapman* v. *First Nat. Bank*, 72 Or. 492 (143 Pac. 630); *Saratoga Inv. Co.* v. *Kern*, 76 Or. 243 (148 Pac. 1125).

3–5. The second phase of the defense presented by the answer involves an alleged account stated. The relationship of debtor and creditor exists between a bank and its depositor; and an account stated may result from writing up and delivering a pass-book to the depositor if he fails to object within a reasonable time: *Nodine* v. *First Nat. Bank*, 41 Or. 386, 390 (68 Pac. 1109); *Hanan* v. *Sanford*, 69 Or. 204, 209 (137 Pac. 772). A party is not precluded, however, from disputing an account if his failure to object was induced by fraud or resulted from his reliance upon a false representation made by the other party concerning some material fact: *Kinney* v. *Heatley*, 13 Or. 35 (7 Pac. 359). An alleged account stated may be impeached for fraud, error or mistake: *Fleischner, Mayer*

*& Co.* v. *Kubli,* 20 Or. 328, 338 (25 Pac. 1086) ; 1 C. J. 709.

6, 7. The Goodhart letter and answer furnish the cornerstone for the estoppel relied upon by the defendant. Only those to whom a representation is made or their privies can take advantage of it as an estoppel: *Falls City Lumber Co.* v. *Watkins,* 53 Or. 212 (99 Pac. 884) ; *Sabin* v. *Phoenix Stone Co.,* 60 Or. 378 (118 Pac. 494, 119 Pac. 724). The bank examiner was not an agent or officer of the bank, nor did he pretend to write the letter as the representative of the bank: *Carlon* v. *First Nat. Bank, ante,* p. 539 (157 Pac. 809). He represented a department of the government which supervises and controls national banks: *Witters* v. *Sowles* (C. C.), 32 Fed. 762. Furthermore, assuming even that Goodhart was acting for the bank, still the defendant could not assert an estoppel if the signature of the plaintiff was obtained by false representations and deceit on the part of the president of the bank: Bigelow on Estoppel (5 ed.), 583; *Carlon* v. *First Nat. Bank, ante,* p. 539.

The record reveals evidence to support every position taken by the plaintiff. Sheridan owed approximately $175,000 as early as April, 1911, and the burden became so heavy that he made an assignment of his property for the benefit of his creditors on November 7, 1913, and was afterward adjudged a bankrupt. The evidence is sufficient to convince any reasonable mind that Sheridan had a motive for obtaining the money of plaintiff. On April 6, 1911, Sheridan wrote to the plaintiff that, if she wished to reloan $4,000 which had been paid to her on a mortgage, he would get her a good loan. In response to the letter she went to the First National Bank in company with her son and consulted with Sheridan, who,

she says, told her it would be better to loan the money than to buy real estate. She also testified that not a word was said about Sheridan borrowing the money; that she did not expect him to make a loan without consulting her, and "I told him that I would think it over; I could not make up my mind that day what I would rather do." She told the jury that "the bank was to make the loan for me," and "when I speak of Mr. Sheridan I speak of him as being the bank, doing business with him as the bank." Corroboration of her version of the conversation with Sheridan is found in the testimony of her son, F. L. Verrell, who says:

"Mother had occasion to go into the bank on business, and Mr. Sheridan asked her if she did not want to loan what money she had on deposit in the First National Bank, and Mother told him no that she thought she would invest that money in real estate, and Mr. Sheridan told her that he would not advise her to invest that money that way, for the reason that real estate was too high at that time to invest money in that way, and he told her that she had better let the bank loan the money for her, and that she would get a good rate of interest, probably 7 or 8 per cent, and good security."

On April 15, 1911, Sheridan filled out a memorandum check or charge ticket so as to make it read thus: "Memorandum check First National Bank Roseburg, Oregon, 4-15, 1911. Loaned $5,000—charge Laura M. Verrell." . Sheridan used the memorandum check as a voucher and then withdrew the money. The plaintiff had no knowledge of this memorandum check until some time after the consolidation of the First National Bank with the Douglas National Bank, when Sheridan handed the check to her in the latter bank.

The charter of the First National Bank was about to expire, and on that account R. W. Goodhart, a

national bank examiner, was examining the defendant for the renewal of its charter. During this examination Goodhart discovered that $5,000 had been charged against the account of the plaintiff, and was told by Sheridan that the plaintiff had authorized the withdrawal. The letter was written to verify the statement made by Sheridan. The controller of the currency never passed upon the question of the renewal of the charter, for the reason that the defendant was consolidated with the Douglas National Bank, and all its checking accounts were transferred to the latter institution. The First National Bank closed its doors to new business on Saturday, June 17, 1911, and on that day a circular letter was issued by the two banks announcing that:

"A consolidation of the two banks has this day been perfected. The combined business will be continued in the rooms of the Douglas National Bank and under its name."

The banks also gave publicity to the merger through the press. Sheridan was made a director of the Douglas National Bank, and had a desk in its banking-room. This was the situation when the plaintiff went to the Douglas National Bank on June 20, 1911, and found Sheridan at his desk; and it is not surprising that she "supposed that he was president of the bank and doing business there as usual," and "supposed that he was president of the bank the same as he had been," and "supposed that they were all in one bank; I thought that the two were in one bank." It was on this occasion that she signed the answer to the Goodhart letter. Her explanation of the transaction is to the effect that Sheridan told her that she would receive a letter from the bank examiner, and requested that she sign and

return the letter. When she received the letter, she took it to Sheridan on June 20, 1911, and showed it to him, and after reading it "he made out as though it was not of any great account, only he said there had been a change made in the bank, and I was to sign that letter"; and she then signed the letter because she knew nothing about business and trusted him. The plaintiff did not know that Sheridan had misappropriated her money when she signed the Goodhart letter, nor did she know that the bank was claiming that the money had been borrowed by him until November 1, 1913, when the grand jury was making an investigation.

The pass-book was balanced May 8, 1911, and merely shows the date "April 15th" and the amount "$5,000" in the proper columns without any additional information. The plaintiff testified that she first knew that $5,000 was charged against her account when Sheridan handed her the memorandum check in the Douglas National Bank after the banks had consolidated. She explains the incident thus:

"A. He handed me this check. I had never saw a check like this before, and I looked at the check and accepted the check because I supposed it was all right. I never saw a memorandum check before, and I did not know anything about such things, and he told me that my money was well invested, and I supposed that this was to show that the bank had loaned my money; that this was to show that they had loaned the money for me; that is what I thought."

Neither the pass-book nor the memorandum check nor the two combined show or intimate to whom the $5,000 was loaned. The plaintiff understood that the bank had made a loan for her on good security, and, not being experienced in business matters, she made

no further inquiry. The facts as pleaded and testified to by plaintiff were sufficient, if believed by the jury, to defeat every defense relied upon by the defendant.

8. The defendant complains of certain remarks made by the circuit judge during the course of the trial, but an examination of the record convinces us that no improper statement was made in the presence of the jury. The court merely told counsel what he considered the issues were, and gave the attorneys his opinion of the law applicable to certain phases of the controversy. The court did not attempt to decide any question of fact. Moreover, all possibility of prejudicial error was removed when the court said in the final charge to the jury:

"Now, gentlemen, you are the exclusive judges of the facts in the case and the credibility of the witnesses. The law provides, however, that it is the duty of the court to instruct you as to the law applicable to the facts, whilst it is your exclusive province to judge all the facts, and, if during the course of this trial you could have received any impression from the court as to what the facts are, it would be your duty to disregard them and find the facts as you find them to be, without in any way being influenced in any manner whatever by the court."

Both parties assume in the printed briefs that Sheridan signed a promissory note payable to plaintiff, and then placed the note in the bank vault. There is not a word of testimony, however, which will warrant this assumption.

The instructions given to the jury, the refusal to give certain requested instructions, the denial of the motion to strike from the reply, and the rulings upon the objections to evidence, were in harmony with the views expressed here. The theory advanced by the

80 Or.—36

plaintiff was adopted by the jury, and there was evidence to support every fact involved in the verdict.

The judgment is affirmed. AFFIRMED.

MR. CHIEF JUSTICE MOORE and MR. JUSTICE EAKIN absent.