Argued April 19, affirmed November 15, 1927, rehearing denied February 28, 1928.

# SECURITY SAVINGS & TRUST CO. *v.* PORTLAND FLOUR MILLS CO. ET AL.

### (261 Pac. 432.)

**Set-off and Counterclaim—"Set-off" is Demand Made by Defendant Against Plaintiff for Purpose of Liquidating Claim or Part Thereof.**

1. "Set-off" is a demand which defendant makes against plaintiff in lawsuit, for purpose of liquidating the whole or part of his claim.

**Set-off and Counterclaim—Set-off is Authorized Only in Judicial Action Where Mutual Claims are Involved.**

2. To authorize set-off, there must be mutuality in claims liquidated and judicial action between parties.

**Set-off and Counterclaim—Preparation by Stockholder Controlling Total Stock of Corporations, of Consolidated Financial Statement, Held not Set-off of Debt Owed Him by One Corporation as Against Debt Which He Owed Other Company.**

3. Direction of stockholder controlling all stock in two corporations that consolidated financial statement should be made of his indebtedness due such corporations, for purpose of expediting sale of corporations' bonds, and preparation of such statement under his direction, *held* not to constitute set-off of debt owed him by one corporation as against debt which he owed to other, where there was no contract or agreement entered into by corporations, and where corporations, though controlled by single stockholder, conducted business entirely separate from each other.

**Corporations—Doctrine of Corporate Entity Held to Apply to Corporations Exclusively Controlled but Doing Business Separately, as Against Claim That Consolidated Financial Statement of Stockholder's Indebtedness Constituted Set-off.**

4. Doctrine of corporate entity *held* to apply to corporations exclusively controlled by one stockholder but doing business separately, where it was claimed that consolidated statement of owner's indebtedness amounted to set-off of claims as between stockholder and corporation.

**Corporations—Doctrine of Corporate Entity will be Disregarded Where Application of Rule Would Perpetrate Fraud.**

5. "Corporation" is artificial person governed by general rules of law applicable to rights of individuals, but fiction of corporate

1. Set-off defined, see note in 16 **A. L. R.** 327. See, also, 24 **R. C. L.** 792.
2. See 24 **R. C. L.** 855, 858.
4. See 7 **R. C. L.** 27.

entity, will be disregarded by equity for purpose of preventing perpetration of fraud.

**Assignment for Benefit of Creditors—Assignee Takes Assignor's Title to Claims Subject to Defenses Available Against Assignor at Time of Assignment.**

6. Assignee for benefit of creditors acquires no better title to claims of assignor than assignor himself had at time of assignment, and claims are subject to all defenses which could have been made against assignor.

**Estoppel—Assignee for Creditors Held not Estopped to Deny Validity as Set-off of Consolidated Statement of Indebtedness of Assignor to Two Corporations Which He Exclusively Controlled.**

7. Assignee for benefit of creditors, in suit to recover claim of assignor against corporation which assignor controlled, *held* not estopped to deny that transaction by which assignor prepared consolidated financial statement of his indebtedness to two corporations constituted set-off as between corporations, in which all stock was controlled by assignor, where no misrepresentation as to assignor's accounts with separate companies was involved.

**Evidence — Assignor's Unauthorized Statements Made Subsequent to Assignment and Without Assignee's Knowledge or Consent are not Binding on Assignee.**

8. Where statements made by assignor subsequent to assignment for benefit of creditors are made without assignee's knowledge or consent or authority they are not binding upon assignee.

**Assignment for Benefit of Creditors—Right of Assignee to Enforce Assignor's Claim Becomes Vested on Assignment and cannot be Divested by Third Person's Unauthorized Acts.**

9. Right of assignee for benefit of creditors to enforce assignor's claims becomes vested at date of assignment and cannot be divested by any subsequent unauthorized act of third parties.

**Estoppel—To Constitute "Equitable Estoppel," There must have Been Some Omission, Misconduct or Misrepresentation by Party or Someone in Privity With Him Which Misled Other Person and Induced Him to Change His Position.**

10. To constitute "equitable estoppel" there must have been some omission, misconduct or misrepresentation by party against whom estoppel is asserted, or someone in privity with him, which misled another and induced him to alter his position in some material respect.

6.  See 2 R. C. L. 657.
7.  See 2 R. C. L. 657.
9.  See 2 R. C. L. 659.
10.  See 10 R. C. L. 688.

**Estoppel—Only Parties Making Representation and Their Privies are Bound, and Only Parties to Whom Representation is Made and for Whom It is Intended and Their Privies may Take Advantage of Estoppel.**

11. Only parties making representation and their privies are bound by representation, and only those to whom representation is made or whom it is intended to influence and their privies may take advantage of estoppel.

**Estoppel—Purchasers of Bonds and Their Successors Claiming Estoppel Held not in Privity With Stockholder's Employee and Representative of Bond Underwriter to Whom Stockholder Made Representations to Induce Sale of Bonds.**

12. Representations of controlling stockholder of corporations in directing preparation of consolidated financial statement to induce sale of bonds, where made only to employee and representative of underwriter of bonds, could not be availed of by purchasers of bonds or their successors in interest as constituting estoppel, on account of lack of privity.

**Reformation of Instruments—Court Held Without Authority to Reform Schedule of Liabilities Assumed by Corporation Taking Over Other Corporation's Assets, to Include Simple Claim of Unsecured Plaintiff not Party to Transaction.**

13. In suit by assignee for creditors against corporation taking over assets of another corporation and assuming specified liabilities, court had no power or authority to direct reformation of schedule to include liability due plaintiff, where plaintiff had failed to put claim in judgment and had not obtained attachment or other lien upon defendant corporation's property and was not party to contracts under which liabilities were assumed.

**Reformation of Instruments—Equity will Interfere to Reform Written Instrument Only as Between Original Parties and Privies.**  *

14. In all cases of mistakes in written instruments, court of equity will interfere only as between original parties or those claiming under them in privity, such as personal representatives, heirs, devisees, grantees or judgment creditors.

**Corporations—Simple Contract Creditor cannot Generally Satisfy His Debt from Equitable Estate of Corporation not Subject to Levy, Except by Obtaining Judgment With Execution Thereon Returned Unsatisfied.**

15. Generally, where creditor of corporation seeks to satisfy his debt out of equitable estate of corporation not liable to levy and sale under execution, he must obtain judgment and have execution returned unsatisfied, or, in case of suit to set aside fraudulent conveyance, he must have obtained benefit of attachment lien.

---

11. See 10 R. C. L. 837.

14. See 23 R. C. L. 338.

15. Judgment at law, when a prerequisite to creditor's suit, see notes in 25 Am. Dec. 313; 66 Am. St. Rep. 276. See, also, 8 R. C. L. 20, 23.

**Corporations—Where Corporation is Insolvent, Creditor Need not Put Claim in Judgment Before Bringing Creditor's Bill.**

16. Where debtor is insolvent corporation, rule that simple contract creditor must first obtain judgment and unsatisfied execution on corporation's property before bringing creditor's bill to satisfy his debt out of corporation's equitable estate does not apply.

**Corporations—Simple Contract Creditor of Insolvent Corporation, Which Transferred All Its Assets, was Entitled to Maintain Suit Against Transferee Corporation Without Reducing Claim to Judgment.**

17. Where corporation had turned over all its assets to another corporation and was insolvent and no longer a going concern, a simple contract creditor was entitled to maintain suit against transferee corporation without first reducing his claim to judgment and having execution returned thereon unsatisfied.

**Corporations—Transferee of Insolvent Corporation's Assets, Assuming Only Specified Liabilities, not Including Plaintiff's Claim, Held Nevertheless Liable to Plaintiff Creditor as Trustee Under Agreement to Repay Excess to Transferor.**

18. Creditor of insolvent corporation, which transferred its assets to another corporation, assuming certain specified liabilities under lease agreement, *held* entitled to recover against transferee corporation, notwithstanding particular claim was not mentioned, under provision that transferee should, upon expiration of lease, pay over to transferor all remaining assets after transferee's reimbursement, as remaining assets constituted trust fund.

**Estoppel—Rule Estopping Mortgagor from Denying Title Set Forth in Mortgage Held not to Apply to Corporation's Assets Treated as Distinct from Mortgaged Property.**

19. Rule estopping mortgagor from denial, as against purchaser, of title which he has set forth in mortgage, *held* not to apply to property of corporation which was treated as entirely separate and distinct from mortgaged property.

**Corporations—Transferee's Ignorance of Transferor Corporation's Indebtedness Held not to Defeat Right of Creditor Where Transferee Corporation Agreed to Pay Over to Transferor Excess Realized After Liquidation of Accounts.**

20. Fact that corporation to which assets of other corporation were transferred had no notice of existence of indebtedness of transferor *held* not to defeat right of transferor's creditor, where transferee assumed obligation to pay over to transferor excess realized after liquidation of accounts.

**Fraudulent Conveyances—Preparation of Consolidated Financial Statement Between Corporations and Stockholder, Where Nothing was Paid or Secured, Held not Preference.**

21. Preparation of consolidated financial statement as between stockholder and corporation, under which nothing was paid or secured to be paid, *held* not to amount to preference by stockholder of one of his creditors.

**Fraudulent Conveyances—Insolvent Debtor may Prefer Creditors, Unless Prevented by Bankruptcy Act or Other Rule of Law.**

22.   Insolvent debtor may prefer one creditor over another, provided preference is not in violation of Bankruptcy Act or some other rule of law.

**Corporations—Insolvent Corporation, if Going Concern, may Prefer Creditors, Unless Preference is One Which Law Condemns.**

23.   Insolvent corporation may prefer creditors, if it is going concern at time of preference and preference is not one which law condemns.

**Fraudulent Conveyances—"Preference" is Payment in Full or in Part of One Claim to Exclusion of Others.**

24.   "Preference" is paying or securing to be paid in all or in part one claim to the exclusion of other claims.

Accounts and Accounting, 1 **C. J.,** p. 642, n. 96.
Appeal and Error, 4 **C. J.,** p. 731, n. 81.
Bankruptcy, 7 **C. J.,** p. 148, n. 64.
Assignments for Benefit of Creditors, 5 **C. J.,** p. 1188, n. 53, p. 1189, n. 55, 56, p. 1190, n. 57.
Corporations, 14 **C. J.,** p. 51, n. 13, p. 53, n. 26, p. 58, n. 67, p. 59, n. 71, p. 61, n. 78; 14a **C. J.,** p. 895, n. 50, p. 897, n. 53, p. 899, n. 74.
Creditors' Suits, 15 **C. J.,** p. 1387, n. 47, p. 1388, n. 48, 58, p. 1390, n. 73, 75, 76, p. 1391, n. 79, p. 1394, n. 40, p. 1396, n. 61, 64.
Equity, 21 **C. J.,** p. 87, n. 45.
Estoppel, 21 **C. J.,** p. 1113, n. 52, p. 1119, n. 12, 13, p. 1120, n. 14, p. 1126, n. 51, p. 1133, n. 76, p. 1179, n. 30, p. 1180, n. 32, 34.
Evidence, 22 **C. J.,** p. 408, n. 90, p. 741, n. 19.
Fraudulent Conveyances, 27 **C. J.,** p. 613, n. 82, p. 617, n. 8.
Novation, 29 **Cyc.,** p. 1130, n. 6, p. 1131, n. 12, 14.
Recoupment, Set-off and Counterclaim, 34 **Cyc.,** p. 625, n. 14, 15, p. 649, n. 51, p. 650, n. 58, p. 712, n. 15, p. 757, n. 57.
Reformation of Instruments, 34 **Cyc.,** p. 950, n. 68, p. 951, n. 72, 77.

From Multnomah: ROBERT G. MORROW, Judge.

Department 1.

AFFIRMED.   REHEARING DENIED.

22.   Preferences which may be created by assignments for benefit of creditors, see notes in 26 **Am. Dec.** 584; 6 **L. R. A.** 571; 12 **L. R. A.** 808. See, also, 2 **R. C. L.** 690. When preferences make assignment for benefit of creditors void, see notes in 30 **Am. St. Rep.** 816; 34 **Am. St. Rep.** 856. See, also, 2 **R. C. L.** 698. Right of insolvent debtor to make preferences, generally, see note in 11 **L. R. A.** 466. See, also, 14 **R. C. L.** 864.
23.   Preferences by insolvent corporations, see notes in 42 **Am. St. Rep.** 767; 45 **Am. St. Rep.** 826; 15 **Ann. Cas.** 1218; 19 **A. L. R.** 320; 22 **A. L. R.** 802; 38 **A. L. R.** 90; 48 **A. L. R.** 470. See, also, 2 **R. C. L.** 695; 7 **R. C. L.** 755.

For appellants there was a brief over the name of *Messrs. McCamant & Thompson,* with an oral argument by *Mr. Wallace McCamant.*

For respondent there was a brief over the names of *Messrs. Dolph, Mallory, Simon & Gearin, Messrs. Wilbur, Beckett, Howell & Oppenheimer* and *Messrs. Carey & Kerr,* with oral arguments by *Mr. E. K. Oppenheimer* and *Mr. James B. Kerr.*

RAND, C. J.—The plaintiff, Security Savings & Trust Company, as the assignee of M. H. Houser under an assignment for the benefit of creditors, brought this suit in equity to recover from the Pacific Coast Elevator Company the sum of $64,835.82 and interest thereon since July, 1920, at the rate of 6 per cent per annum, and to compel the defendant, Portland Flour Mills Co., to account for and pay said sum to plaintiff out of certain moneys, which it is alleged have been received by it and should, under equitable principles, be applied in payment of said sum.

The suit grows out of the following facts: In July, 1920, Houser sold and conveyed certain warehouses to the defendant, Pacific Coast Elevator Company, for the agreed price of $64,835.82 and received a credit on its books for that amount, no part of which has ever been paid. At that time he was indebted in a much larger sum to the Portland Flouring Mills Company, of which company the defendant, Portland Flour Mills Co., is the successor in interest. At the time referred to, the Portland Flouring Mills Company and the Pacific Coast Elevator Company were corporations which had been organized for a great many years; the first for the purpose of purchasing and selling grain and the manufacture and sale

of flour, and the latter for the purpose of owning and operating warehouses for grain storage. Each owned assets and properties of great value and were transacting a very large volume of business. The Portland Flouring Mills Company owned all of the capital stock of the Pacific Coast Elevator Company and all of its capital stock, except a few shares which were owned by the Houser Investment Company, was owned by Houser and Houser owned all of the stock of the last named company. He was the president of both companies and, through his stock ownership, had absolute control of the corporate business of both. These corporations, however, had always maintained their separate corporate existence, conducted business in their own names, kept separate books of account, and each had its own individual assets and creditors. Their offices were maintained separately and neither corporation was a mere adjunct or instrumentality of the other.

In February, 1921, the Portland Flouring Mills Company issued bonds aggregating $3,000,000, which were secured by a mortgage given by the Portland Flouring Mills Company, Pacific Coast Elevator Company and four other corporations whose stock was also owned by the Portland Flouring Mills Company. By the terms of this mortgage, all of the properties and assets of these various corporate mortgagors, then owned or thereafter to be acquired, were pledged for the payment of said bonds, and the plaintiff, Security Savings & Trust Company, was named in said mortgage as the trustee for the bondholders.

Before the execution of said mortgage, Houser employed the firm of Haskins & Sells, who were public accountants, to audit the books and to prepare a consolidated financial statement of the combined assets and liabilities of the six corporate mortgagors for

use in the sale of the bonds and, at the same time, he contracted with Blyth, Witter & Company, investment bankers, to underwrite the bonds. While auditing the books, R. J. Leo, who was the manager of the Portland office of Haskins & Sells, found that the books of the Portland Flouring Mills Company showed that Houser owed to that company, upon an open, unsecured account, the large sum of money above referred to. Thinking that this large indebtedness upon an open, unsecured account by the president of one of the corporate mortgagors might affect the sale of the bonds, Leo called this matter to the attention of George Leib, the vice-president of Blyth, Witter & Company, and together they went to the office of Houser and stated to him, in effect, that his large indebtedness to the Portland Flouring Mills Company, of which he was president, upon an open, unsecured account might defeat the sale of the bonds. Thereupon Houser paid to the Portland Flouring Mills Company the sum of $29,000 as part payment of his said indebtedness and both Leo and Leib testified that Houser instructed Leo to make the financial statement he was about to prepare show a set-off of the amount due him from the Pacific Coast Elevator Company against the amount he was owing to the Portland Flouring Mills Company. Pursuant to such instructions, Leo prepared a consolidated financial statement, showing the combined assets and liabilities of the corporate mortgagors and a copy of this financial statement, attached to which was a letter written by Haskins & Sells to Houser, was delivered to Houser, which financial statement and attached letter were offered and received in evidence as Defendants' Exhibit 147.

On June 30, 1921, Houser made an assignment to plaintiff for the benefit of his creditors and, as such

assignee, plaintiff is now seeking to recover the amount originally owed by the Pacific Coast Elevator Company to Houser and upon the trial of the cause obtained a decree against the Pacific Coast Elevator Company and the Portland Flour Mills Co. for the full amount claimed.

The defendants, Portland Flour Mills Co. and the Pacific Coast Elevator Company, by their separate answers, alleged and it is now contended that Houser's directions to Leo to set off one account against the other in said financial statement and the acts done by Leo pursuant to such directions in combining the two accounts, as shown in Exhibit "C" of Defendants' Exhibit 147, constituted a set-off of the amount due Houser from the Pacific Coast Elevator Company against the amount due from him to the Portland Flouring Mills Company and resulted in the cancellation and discharge of the debt before the assignment was made and, therefore, was not a valid and subsisting obligation when the assignment was made and, that plaintiff, as the assignee of Houser, is and of right should be estopped to contend that the alleged set-off was not consummated or that the obligation of the Pacific Coast Elevator Company to pay Houser was not canceled and discharged by said alleged set-off. These contentions will now be considered in their order.

The only attempt appearing in the evidence to combine the items in question at any time prior to the making of the assignment is that shown on Exhibits "A" and "C" of Defendants' Exhibit 147, to which we will again refer. The letter of Haskins & Sells to Houser, which is attached to Exhibit 147, contains no reference to this alleged set-off. The consolidated statement consists of what is termed in the letter as three pages of comments, attached to which are three

documents, designated by Leo as Exhibits "A," "B" and "C." Exhibits "A" and "C" contain a consolidated and combined statement of all of the properties, assets and liabilities of the six corporations which were to become the corporate mortgagors. Exhibit "A" shows under "Current Assets" that M. H. Houser was indebted to the six corporations, when treated as a unit, in the sum of $203,050.39 and that his indebtedness to these corporations treated as a unit increased from $50,000 on June 30, 1920, to the sum just stated. There are no figures given in Exhibit "A" in explanation of what amounts made up said increased amount. Exhibit "C" is headed "The Portland Flouring Mills Company and subsidiary companies," followed by the words "General Balance Sheets, February 12, 1921, and Consolidation." The only reference it makes to this alleged set-off is that under the words "Current Assets" appears the name "M. H. Houser" and opposite to this name, in the column headed "Consolidation Total," appear the figures $203,050.39. Opposite to this item and in the column headed "The Portland Flouring Mills Company," appear the figures "$267,886.21," which are written in black ink. Opposite to this and on the same line, under the heading of "Pacific Coast Elevator Company," appear the figures "$64,835.82," which are written in red ink, and this shows that Houser was indebted to the Portland Flouring Mills Company in the sum of $267,886.21, and that the Pacific Coast Elevator Company was indebted to him in the sum of $64,835.82.

It is undisputed in the evidence that the fact that the amount of $64,835.82, appearing in the column under the heading "Pacific Coast Elevator Company" in Exhibit "C" of Exhibit 147, because of the amount being written in red ink indicated a liability

of that company to Houser in that amount. It is also admitted that no change was made in the entries on the books of Houser's account with either of said corporations and that these accounts as they now appear upon the books show Houser's indebtedness to the Portland Flouring Mills Company and the Pacific Coast Elevator Company's indebtedness to Houser. Nor is it claimed that Leo made or had authority to make any change in the entries of these accounts on the books of the respective companies.

1, 2. In law a set-off is a demand which a defendant makes against the plaintiff in the suit for the purpose of liquidating the whole or a part of his claim: Bouvier's Law Dictionary (subject, "Set-off)." Mutual debts do not cancel one another without judicial action: 2 Williston on Contracts, § 859. To authorize a set-off there must be a mutuality in the claims: *Sanford* v. *Pike*, 87 Or. 614, 620, 623 (170 Pac. 729, 171 Pac. 394); *Kinney* v. *Tabor*, 62 Mich. 517 (29 N. W. 86); 24 R. C. L. 858.

3. The two corporations in question were separate and distinct corporate entities, and hence there could be no mutuality in Houser's claim against one of them and in the other's claim against him, and, therefore, no set-off could result unless there was some contract or agreement concurred in by all of the parties in interest, and if there was such contract or agreement it must have been based upon some consideration. To have accomplished the result contended for, it would have been necessary either for the Pacific Coast Elevator Company, by order of Houser, to have paid the Portland Flouring Mills Company the amount of its indebtedness to Houser, or to have entered into some obligation with the Portland Flouring Mills Company as a consideration for its discharge of Houser from that much of his indebtedness

to it. If the latter had been done it would have amounted to a novation, and would have required the assent and concurrence, not only of Houser, but of both corporations. It is not even pretended that the Pacific Coast Elevator Company paid or contracted to pay, or entered into any new obligation with the Portland Flouring Mills Company as a consideration for the discharge of any part of Houser's debt.

4. The defendants' argument, however, is that since Houser owned all of the stock of the two corporations and was exercising absolute control over both, the legal fiction that a corporation is to be regarded as a legal entity existing separate and apart from the natural persons composing it should be disregarded, and that these accounts should be treated as if they were different accounts between Houser and one and the same corporation. The maxim that in a legal fiction equity always exists is applicable here. For many years these two corporations have been actively engaged in business. They had each maintained their separate corporate existence; had conducted business in their own names, and each had its own assets and creditors and kept separate books of account, and there was nothing tending to show that either corporation was a mere adjunct or instrumentality of the other. Under such circumstances the fact that Houser was the only stockholder is not a controlling factor, for the Portland Flouring Mills Company and its creditors were entitled to have its accounts kept separate and apart from those of the Pacific Coast Elevator Company, and to have its assets applied in satisfaction of the obligations of the Portland Flouring Mills Company. Under the circumstances disclosed by this record, we think it would be clearly inequitable to disregard the distinction which exists between a corporation and its stock-

holders, and to treat Houser as if he were the only party in interest, when by so doing the Portland Flouring Mills Company and its creditors would have had Houser's *bona fide* indebtedness to the corporation reduced from $189,580.38 to the sum of $124,-744.56, without receiving as an offset to its loss any corresponding gain or advantage whatever. There are cases where in order to prevent fraud or injustice it is necessary to disregard the fiction of a distinct corporate existence, as where one corporation is so organized and controlled and its affairs are so conducted as to make it a mere instrumentality, conduit or adjunct of another corporation; or where a corporation is fraudulently organized to take over the assets of another corporation in order to defraud its creditors. See 1 Fletcher, Cyc. Corp., §§ 42-45, and cases there cited.

5. It is a general principle that equity will disregard the corporate fiction for the purpose of preventing the successful perpetration of a fraud. In the cases just referred to the reason for the application of the rule is to prevent fraud and not because the capital stock is owned by one person. The rule would be applicable to such a case whether the shares were owned by one person or many. See 2 Machen, Modern Law of Corporations, § 1089. But there is no room for the application of the rule under the facts shown in this case. To disregard the separate corporate existence of these two corporations in this case and treat these accounts as if the Portland Flouring Mills Company were the only corporation interested, and then to offset one account against the other without any consideration accruing to the Portland Flouring Mills Company for the reduction of Houser's indebtedness to it would work a fraud on the creditors of the Portland Flouring Mills Company. We think

that the applicable rule to dealings between two corporations, under the facts disclosed here, is that stated by Judge Noyes in his work on Intercorporate Relations, Section 1, as follows:

"A corporation is an artificial person, created by law, having, within the limits of its chartered powers, the rights of a natural person in the transaction of business. It is governed by the general rules of law relating to rights of property, contracts and torts which apply to individuals. Its relations with other corporations, as persons, are essentially the same as the relations of natural persons."

6. Defendants' next contention that because of the acts and conduct of Houser above referred to, plaintiff, as Houser's assignee, is estopped to deny the validity of the alleged set-off we think is untenable. It is true as contended for by defendants that plaintiff, as an assignee under an assignment for the benefit of creditors, is not an innocent purchaser and could acquire through the assignment no better title to this claim against the Pacific Coast Elevator Company than Houser himself had at the time the assignment was made and, in this suit, the claim is subject to all the defenses which could have been made against Houser if Houser were the plaintiff in this suit and had commenced the suit on the day when the assignment was made: *Jacobs* v. *Ervin*, 9 Or. 52, 56; *Cammons* v. *Holman*, 11 Or. 284 (3 Pac. 676); *Helm* v. *Gilroy*, 20 Or. 517, 521 (26 Pac. 851); *O'Connell* v. *Hansen*, 29 Or. 173 (44 Pac. 387).

7. The only evidence appearing in the record of what Houser's instructions were in respect to this alleged set-off is the testimony of Leo and Leib and the only thing done pursuant to such instructions, so far as the record shows, was the preparation by Leo of the

124 Or.—19

financial statement above referred to and the issuance by Blyth, Witter & Company of a circular which was sent to the persons who subsequently became the purchasers of the bonds issued by the Portland Flouring Mills Company. Both Leo and Leib testified that Houser instructed Leo to set off one account against the other in the financial statement he was about to prepare and that Leo made the set-off as he had been directed to do. But their testimony also shows that this was not the only direction given by Houser; that Houser had instructed Leo to prepare a financial statement showing the combined assets and liabilities of the six corporate mortgagors and, in such statement, to set off one account against the other. Now, Leo prepared the statement which he had been directed to make and this statement was delivered to and accepted by Houser and there is no contention that it did not conform implicitly to Houser's directions. As prepared, as we have shown, it contained a true statement of the two accounts as they then appeared and now appear on the books of the companies. If Leo was competent to prepare the financial statement, and no one contends that he was not, and if it was prepared in the manner directed, and no one even pretends that it was not, then the most satisfactory evidence of what Houser's instructions were is to be found, not in the interpretation that Leo and Leib placed upon them while on the witness-stand, but rather in what was done by Leo, namely: in the financial statement itself. What Leo did was not to set off one account against the other but to show both accounts as they actually appeared on the books of the two companies, showing one as a liability owing to Houser and the other as a liability owing by him, and then, in another column, showing the net liability of Houser to all of the six corporate mortgagors when

treated as but one concern, as was then being done. As so prepared, there was no misrepresentation as to either account and nothing which could or did mislead anyone. Both Leo and Leib understood the truth of the matter and when the financial statement was called to the attention of numerous accountants, who were witnesses in the case, they all testified that it showed an existing liability of the Pacific Coast Elevator Company to Houser in the sum of $64,835.82, and there is no testimony to the contrary.

8, 9. There is, however, some evidence tending to show that subsequent to Houser's assignment of this claim to plaintiff, some accounts were prepared by employees of the Portland Flouring Mills Company tending to show that a set-off of these two accounts had been made, and reference was made thereto by defendants in their brief. But since it is not contended that such statements were made with plaintiff's knowledge or consent, or under its authority, they were not binding upon plaintiff. Plaintiff's right to enforce this claim became vested when the assignment was made and could not be divested by any unauthorized act of any third party. As to plaintiff, such acts are *res inter alios acta.*

Mr. Leib testified that in the sale of these bonds by Blyth, Witter & Company, a circular was sent to each purchaser of the bonds and a copy of this circular, together with a letter signed by Houser which was attached to the circular and sent to such purchasers, was offered and received in evidence as Defendants' Exhibit 111. The circular recites that the accounts receivable of the six corporate mortgagors amounted to $1,994,616.01, and that the total assets of the corporate mortgagors amounted to $10,179,039.06. But it contained no reference which could lead anyone to believe that any account going to make up the

amount of the accounts receivable had been set off against any other account, nor did it contain any figures or data from which that fact, if it had been a fact, could have been ascertained by any computation of any figures contained in the circular.

It is clear from the evidence that no one was misled or deceived by anything appearing from the financial statement in respect to these two accounts. The insertion by Leo in red ink of the amount of $64,-835.82, under the name of the Pacific Coast Elevator Company in Exhibit "C" of the financial statement, was intended to and did show upon the face of the exhibit that it was an existing liability of the Pacific Coast Elevator Company for that amount, and as so written it showed that Houser was the person to whom the amount was owing. Since this statement contained, on its face, a true statement of the indebtedness of the Pacific Coast Elevator Company to Houser and could not have been misleading, it affords no grounds for the assertion of an equitable estoppel.

10. To constitute an equitable estoppel, such as that contended for here, there must have been some omission, misconduct, misrepresentation or fraud by the party against whom the estoppel is asserted, or by someone with whom he was in privity, which caused another to be misled and, because of being misled, to have been induced to have altered his position. The very basis of an equitable estoppel is that the party against whom it is urged, or someone in privity with him, has said or done something which he ought not to have said or done, or has omitted to say or do something which he ought to have said or done, and because thereof some other person has been misled and thereby induced to change his position in some material respect: *Haun* v. *Martin,* 48 Or. 304 (86 Pac. 371); *McGregor* v. *Oregon R. & N. Co.,* 50 Or. 527

(93 Pac. 465); *Ashley* v. *Pick,* 53 Or. 410 (100 Pac. 1103); 10 R. C. L. 697; 21 C. J. 1133.

11. Another reason which we think is equally fatal to defendants' contention that Houser would be estopped if he were suing to collect this debt results from the rule that an estoppel applies only to parties and their privies. As said in Bigelow on Estoppel (6 ed.), page 617:

"Only parties and their privies are bound by the representation, and only those whom the representation is made to or intended to influence and their privies may take advantage of the estoppel. If the act was *inter alios,* there can be no estoppel."

To the same effect see *Falls City Lumber Co.* v. *Watkins,* 53 Or. 212 (99 Pac. 884); *Carlon* v. *First Nat. Bank,* 80 Or. 539, 543 (157 Pac. 809); *Verrell* v. *First Nat. Bank,* 80 Or. 550, 557 (157 Pac. 813); *Sabin* v. *Phoenix Stone Co.,* 60 Or. 378 (118 Pac. 494, 119 Pac. 724).

12. Leo was acting as the representative of Haskins & Sells and, as such, was employed by Houser to prepare this statement. While so engaged he was a mere employee of Houser and no more in privity with the subsequent purchasers of the bonds or their successors in interest than any other bookkeeper or employee of Houser. Leib was the representative of Blyth, Witter & Company and defendants' brief recites that Blyth, Witter & Company were the underwriters of the bonds; that being true, they had merely contracted to offer these bonds to the public and if they were not all disposed of they would take over what remained unsold. There is no evidence tending to show that Blyth, Witter & Company, Leo or those for whom he was acting ever became a purchaser or holder of any of these bonds. Blyth, Witter & Com-

pany, therefore, like Leo and those represented by him, were nothing more than a mere instrumentality which had been selected by Houser to aid him in disposing of the bonds to the public and, after the bonds had been thus disposed of, there could be no privity between them and the bondsmen, or their successors in interest, the defendants who are now attempting to assert an estoppel.

There are numerous other objections urged by defendants, for the proper consideration of which many additional facts will have to be stated. The evidence shows that on June 30, 1921, when Houser made his assignment, the Portland Flouring Mills Company and the other corporations, including the Pacific Coast Elevator Company whose capital stock was owned by the Portland Flouring Mills Company, were indebted in large sums of money to four banks in the City of Portland and that the corporations could not continue in business unless the banks advanced other large sums of money. To that end, on August 1, 1921, said banks entered into a contract with said corporations which is referred to in the evidence as the "revolving fund agreement." This contract recited that said corporations had requested the banks to raise a fund of not to exceed $3,000,000 which was to be used by a committee, to be named by the banks, in purchasing for the corporations grain and cereals and provided that such grain and cereals and the products manufactured therefrom should belong to the banks until the banks had been repaid. The agreement also contained a provision by which the banks contracted with each other but not with the corporations that they would raise such fund and that it should constitute a revolving fund and continue in effect to a date not later than July 1, 1922. The evidence shows that pursuant to this agreement, the banks

advanced the money and that the business of the corporations was conducted under said agreement until September 15, 1922. On that date said corporations, with the consent of said banks, demised, leased and let to the defendant, Portland Flour Mills Co., for the term of two years, subject to the right of either party to cancel the lease on sixty days' written notice in the event of the foreclosure of the mortgage given to secure the bonds hereinbefore referred to and the sale of the property therein described, all of the real property owned by said lessor corporations, including

"all flour mills, barley mills, warehouses, office buildings and other structures, fixtures and improvements upon said several pieces or parcels of land, * * together with all machinery, apparatus, automobiles, trucks, wagons, tools, implements, fixtures, appliances, furniture, furnishings, and all other property of every kind which may be situated upon or used in connection with said mills, warehouses, buildings or other structures, or which may be situated upon any of said parcels of land or appurtenant thereto, or used in connection therewith or the business conducted thereon."

Said lessors granted to said lessee, during the term of the lease, the goodwill of the business, the right to use the names and the exclusive use of the brands, trade names and trademarks of the lessors and all the rights, privileges and powers which the lessors would have had if they were carrying on the business. The lease also provided that:

"The lessors hereby agree to assign, transfer and set over to the lessee those assets of the lessors which shall be set forth in a schedule to bear even date herewith and to be prepared and certified to by Messrs. Haskins and Sells, * * and upon such assignment being made, the lessee agrees to assume and discharge those liabilities of the lessors which shall be set forth in said schedule. And it is expressly understood that

the lessee shall assume only those liabilities which are set forth in said schedule.''

The lease also provided that the lessee

''may use in payment and discharge of any current liabilities assumed by it any sums of money which it may receive from the lessors, or any of them, or any sums of money which it may hereafter receive by reason of the liquidation of current assets assigned to it, and in case the lessee shall discharge any of such liabilities out of its own funds, it may reimburse itself from and out of the proceeds of the liquidation of such current assets.''

It also contained the following provision:

''The lessee agrees to purchase at cost those trading assets in the possession of the lessors or of the committee above referred to and which are set forth and priced in the schedule above referred to. Payment therefor shall be made to said committee, or its nominee, immediately upon said trading assets being transferred to the lessee.''

On September 19, 1922, the Sperry Flour Company, a California corporation, of which the defendant, Portland Flour Mills Co. is a subsidiary corporation, entered into an agreement in writing with Honorable Wallace McCamant and others, who constituted a committee appointed by the bondholders, which recited that default had been made by the Portland Flouring Mills Company and the other corporate mortgagors in the payment of interest due on the bonds and provided, subject to certain specified contingencies, that the committee should secure a foreclosure of the mortgage and a sale of the mortgaged property and bid in the property and then transfer the property to the Sperry Flour Company, in consideration of that company issuing and delivering to

the committee for distribution to the bondholders $3,000,000 of its preferred stock. One of the provisions of said contract is as follows:

"In case all of said properties shall be acquired by the vendee under the terms of this agreement, or portions thereof shall be acquired by the vendee under this agreement and such supplemental agreements as may be later made between the parties, the vendee shall, upon transfer of the bonds used in the acquisition by the committee of the property so to be transferred to the vendee, pay in cash the amount of the purchase price of such properties required in addition to the amount provided through the use of the bonds of assenting bondholders to effect said purchase."

Pursuant to the terms of this contract, the mortgage was foreclosed and the mortgaged property was sold and bid in by Mr. McCamant and was conveyed to the defendant, Portländ Flour Mills Co., and to a new corporation organized by the Sperry Flour Company known as the Pacific Coast Elevator Company. The latter company acquired that part of the mortgaged property and assets which had formerly belonged to the defendant, Pacific Coast Elevator Company, and the remainder of the mortgaged property was acquired by the defendant, Portland Flour Mills Co. The said preferred stock was issued and delivered and was distributed by the committee to the bondholders and the bonds were thereupon taken over by the committee and delivered to the Sperry Flour Company, as provided for in said last-named contract.

Pursuant to the terms of said lease, the defendant, Portland Flour Mills Co., entered into possession of the leased property and on September 27, 1922, it entered into two additional contracts with said lessor corporations. The first of said contracts was a

contract for the purchase by said defendant of what is referred to in the contract as the trading assets. Under this contract, the Portland Flouring Mills Company, the Pacific Coast Elevator Company, the Puget Sound Flouring Mills Company, Everett Flour Mill Company, The Harrington Milling Company, and the California-Olympia Flour Company, in consideration of the sum of one million and a half dollars paid to the Canadian Bank of Commerce by the defendant, Portland Flour Mills Co., which will be referred to as the vendee, the said vendors sold, assigned, transferred and set over to the vendee, "all wheat, flour, feed, cereal, sacks, bags, twine, and miscellaneous merchandise or trading stocks of every kind and description," then owned by them or in which they had "any right, title or interest as at the close of business on the 15th day of September, 1922." This contract then provided:

"It is agreed between the parties hereto that said sum of $1,500,000.00 is a partial payment on the purchase price to be paid by the vendee for said 'merchandise stocks' and that said purchase price shall be such amount as is equal to the aggregate actual values of said 'merchandise stocks' as at the close of business on said 15th day of September, 1922, which said values, together with the quantities of said 'merchandise stocks' shall be ascertained and certified to by Haskins and Sells. * * The values and quantities so ascertained and certified to, shall be conclusive upon the parties hereto."

It then provided that the vendee should pay said purchase price

"immediately upon said Haskins and Sells furnishing to the vendee a schedule setting forth the quantities and values of said 'merchandise stocks' * * to the Canadian Bank of Commerce * * for the account of

the banks * * such aggregate amount in excess of said sum of $1,500,000.00 as said Haskins and Sells shall certify to the vendee was due, as at the close of business on September 15, 1922, to the banks * * in no event shall the total payment * * exceed the difference between the aggregate actual values of said 'merchandise stocks' certified to by Haskins and Sells and said partial payment of $1,500,000.00.''

This contract further provided:

'' * * that in case there be any balance of said purchase price due to the vendors after the amount due to the banks hereinabove referred to has been fully paid, then and in such event the vendee may retain said balance and apply the same against advances made or hold the same as security for advances to be made by the vendee in payment of those liabilities of the vendors, or any of them set forth in the schedule of said Haskins and Sells provided for in the lease * * or may use the same in payment of such liabilities, or any other liabilities of the vendors, or any of them, which, in the judgment of the vendee should be discharged, until the expiration, according to its terms of that certain lease made and entered into under date of September 15, 1922. * * ''

It is further provided:

''Upon the expiration of said lease as aforesaid, the vendee shall pay such balance, if any, to the vendors, or their successors in interest, provided that in no event shall the vendee be obliged to pay over funds retained by it hereunder, or otherwise in its possession, until each and every claim which the vendee now has or may hereafter have against the vendors, or any of them has been fully paid, satisfied and discharged, or otherwise disposed of satisfactorily to the vendee.''

It also provided that:

''The vendors and each of them agree to immediately deliver to the vendee such warehouse receipts and

other documents and do such things as may be necessary, to the end that possession of said 'merchandise stocks' shall be immediately obtained by the vendee.''

The other contract to which we have just referred was executed on the same date by the Portland Flouring Mills Company, the Puget Sound Flouring Mills Company, and the other corporations referred to as the parties of the first part and by the Portland Flour Mills Co. as the party of the second part. It provided that said parties of the first part:

''do hereby assign, transfer, and set over (but not by way of sale) unto Portland Flour Mills Co. * * all bills receivable, accounts receivable, and other properties of every kind and description (other than those sold by the parties of the first part to the party of the second part and covered by the agreement or bill of sale bearing even date herewith and other than those leased by the parties of the first part to the party of the second part under that certain lease bearing date, September 15, 1922) * * .''

It then provides that:

''The properties hereby assigned and transferred to the party of the second part may be converted into cash by the party of the second part in which event such cash proceeds may be used by the party of the second part in payment of those liabilities of the parties of the first part, or any of them, set forth in the schedule of Haskins & Sells, * * provided for in the lease hereinafter referred to, or such proceeds may be used by the party of the second part in payment of any other liabilities of the parties of the first part or any of them, which, in the judgment of the party of the second part should be discharged. * *

''The properties hereby assigned or the cash proceeds thereof shall be retained by the party of the second part subject to the provisions hereof until the expiration, according to its terms, of the lease hereinabove referred to. Upon the expiration of said

lease as aforesaid, the party of the second part shall return said properties or the cash proceeds thereof, or such balance of said cash proceeds as may remain in its hands, to the parties of the first part, or their successors in interest.''

Then follows a provision that the party of the second part shall not be obliged to pay over any funds received by it until all of the sums advanced or expended by it have been repaid. It then pro-vides:

'' * * The party of the second part, by accepting this assignment, agrees to conduct the liquidation hereinabove referred to and to do other things to be done by it hereunder in a proper and business-like manner and to keep proper books of accounts with reference thereto.''

The evidence shows that pursuant to the lease and the two contracts last referred to, Haskins and Sells prepared schedules setting forth all of the liabilities of all of the corporations contracting with the defendant, Portland Flour Mills Co., except the particular indebtedness due from the Pacific Coast Elevator Company to plaintiff, and that they also prepared a schedule of assets to be assigned to and liabilities to be assumed by the Portland Flour Mills Co., as of September 15, 1922.  The schedule last referred to was offered and received in evidence as Plaintiff's Exhibit 13.  It would make this opinion too lengthy to set forth this schedule, but after its introduction in evidence, testimony was offered tending to show that the schedule on its face shows that the Portland Flour Mills Co. received property and assets as certified to by Haskins and Sells in excess of the amounts paid out by them of the value of approximately $425,000, and that it now has that sum

in its possession. This testimony was wholly uncon-
tradicted. One of the purposes for which this suit
was brought was to obtain an accounting from the
Portland Flour Mills Co., and that company was in
a position to know exactly what it had received and
exactly what it had paid out and how much, if any-
thing, now remains in its hands unaccounted for. It
offered no testimony upon that subject whatever.
We are, therefore, bound to assume under that testi-
mony and the showing appearing upon the face of
that exhibit that the Portland Flour Mills Co. has in
its possession unaccounted for a much larger sum
of money than the amount for which the plaintiff
obtained a decree in the lower court.

13, 14. This brings us to a consideration under the
facts of the contentions urged by the defendants
against the validity of the decree appealed from.
That decree directed that the schedule provided for
in the agreements, to which we have referred, be re-
formed so as to include in the list of the liabilities to
be assumed by the Portland Flour Mills Co. the name
of this plaintiff and the amount of its claim against
the Pacific Coast Elevator Company. We think that
the lower court had no power or authority to direct
a reformation of the schedule, in respect to the matter
referred to. The rule seems to be universal that "in
all cases of mistake in written instruments, courts of
equity will interfere only as between the original par-
ties or those claiming under them in privity, such as
personal representatives, heirs, devisees, legatees,
assignees, voluntary grantees or judgment creditors,
or purchasers from them with notice of the facts,"
and that to entitle a person to reformation it must
appear he was a party or privy to the transaction
in question and has a substantial interest therein:

Story's Equity Jurisprudence, § 165; 34 Cyc. 950; 21 C. J. 87, note 45; 23 R. C. L. 339; *Coates* v. *Smith,* 81 Or. 556 (160 Pac. 517). It is admitted that neither plaintiff nor its assignor Houser ever commenced any action to recover judgment against the Pacific Coast Elevator Company for the amount due Houser from the sale of the warehouses and that at the time of the commencement of this suit, plaintiff had not obtained any attachment or other lien upon any of the properties or assets acquired by the Portland Flour Mills Co., and was not a party to any of the contracts in question. The plaintiff not being a party to the contracts and it not having reduced its claim to judgment, nor having secured the benefit of an attachment lien, was not in privity with any of the parties to the contracts and, therefore, under the rule just stated, was not entitled to have the schedules reformed. But for the reasons hereinafter stated, we do not think that plaintiff's inability to secure a reformation is fatal to its right to recover in this suit.

15–17. It is contended that the complaint in this suit is in the nature of a creditor's bill and that plaintiff is a mere simple contract creditor of the Pacific Coast Elevator Company and that, not having obtained a judgment at law, it cannot maintain the suit. It is a general rule, and the rule is applicable in this state, that where a creditor seeks to satisfy his debt out of some equitable estate of the defendant in the suit which is not liable to levy and sale under an execution at law, he must obtain a judgment and have the execution returned *nulla bona,* or, if the suit be one to set aside a fraudulent conveyance, he must at least have obtained the benefit of an attachment lien: *Dawson* v. *Coffey,* 12 Or. 513 (8 Pac. 838);

*Dawson* v. *Sims,* 14 Or. 561 (13 Pac. 506); *Fleischner*
v. *First Nat. Bank of McMinnville,* 36 Or. 553 (54
Pac. 884, 60 Pac. 603, 61 Pac. 345); *Leavengood* v.
*McGee,* 50 Or. 233 (91 Pac. 453); *Ryckman* v. *Mane-
rud,* 68 Or. 350 (136 Pac. 826, Ann. Cas. 1915C, 522);
*Goodwin* v. *Tuttle,* 70 Or. 424 (141 Pac. 1120); *Union
Credit Assn.* v. *Corson,* 77 Or. 361 (149 Pac. 318);
*Parks* v. *Watson,* 51 Okl. 19 (151 Pac. 477); *First
National Bank* v. *Manassa,* 80 Or. 53 (150 Pac. 258);
*Hartwig* v. *Rushing,* 93 Or. 6 (182 Pac. 177). See,
also, 4 Pom. Eq. Juris. (3d ed.), § 1415, and 15 C. J.
1387. The reason for the application of the rule is
that in creditors' suits jurisdiction in equity will not
be entertained where there is a remedy at law and
hence, before the suit can be maintained, the creditor,
as a general rule, must have exhausted his remedies
at law. To this rule there are, however, well-recog-
nized exceptions and one of the exceptions which this
court has recognized is where the debtor is an in-
solvent corporation. See *Hodges & Wilson* v. *Silver
Hill Min. Co.,* 9 Or. 200; *Garetson Lbr. Co.* v. *Hinson,*
69 Or. 605 (140 Pac. 633); *Smith* v. *Schmitt,* 112 Or.
687 (231 Pac. 176). The plaintiff is a simple con-
tract creditor of the Pacific Coast Elevator Company
but the Pacific Coast Elevator Company is insolvent.
All of its properties and assets have been transferred
and conveyed to another corporation and it is no
longer a going concern. Under such circumstances
to require the plaintiff to obtain a judgment against
it and then to have an execution returned unsatisfied,
as would happen if such steps were taken, would be
to require, as this court has said, the doing of a vain
and useless thing and one which the law does not
require where the debtor corporation is, as in this case,
admitted to be an insolvent corporation. Hence, if

it should be assumed, which we do not decide, that this is a creditor's suit, the insolvency of the Pacific Coast Elevator Company, which is admitted by all of the parties to the suit, relieves the plaintiff, although a simple contract creditor, of the necessity of first exhausting his remedies at law before becoming entitled to maintain the suit. As was said in *Williams* v. *Alder-Goldman Com. Co.,* 227 Fed. 374:

"A prior judgment at law and unavailing process are not conditions on which equitable jurisdiction is founded. They do not constitute the basis on which the right to equitable relief rests. They are rather an element in procedure and not in equitable right. The facts which they are taken to establish, by the general rule, may be made to otherwise appear, and thus exceptions to the general rule are recognized and have become as well established as the rule itself. * * Nonresidence of the debtor and also his insolvency have each been held sufficient to dispense with prior judgment and execution at law; the first, because of the great impracticability, if not impossibility, of proceeding against the debtor in that way, and the second, because it stands for what the judgment and execution would conclusively prove."

Another well-recognized exception to the general rule above stated is that stated in *Wyman* v. *Wallace,* 201 U. S. 230 (50 L. Ed. 738, 26 Sup. Ct. Rep. 495, see, also, Rose's U. S. Notes), where the court said:

" * * Whenever a creditor has a trust in his favor, or a lien upon property for the debt due him, he may go into equity without exhausting legal processes or remedies. *Tappan* v. *Evans,* 11 N. H. 311; *Holt* v. *Bancroft,* 30 Ala. 193."

This rule was recognized in *Dawson* v. *Coffey, supra,* where this court said:

"It, (a court of equity), would never attempt to enforce the payment of contract debts except under particular circumstances. It must be a case where a fund has been set apart, or in some manner devoted to the payment of a class of debts, before equity will interfere, until the legal remedy is exhausted."

And in *Dawson* v. *Sims, supra,* this court, speaking through Mr. Chief Justice Lord, said:

"Except to satisfy a claim out of some fund accessible only in equity (*Hodges* v. *Silver Mining Company,* 9 Or. 202) the impression has heretofore remained with me that the claim must be first established at law before the equitable jurisdiction can be invoked."

18. While the lease contained the express provision "that the lessee shall assume only those liabilities which are set forth in said schedule," nevertheless it contained the further express provision that the Portland Flour Mills Co. would purchase from the lessors the "trading assets" and that it would pay for the same "immediately upon said trading assets being transferred to the lessee" and, as we have shown, the Portland Flour Mills Co., twelve days later, entered into two subsequent contracts with the lessors, by one of which it acquired all the "merchandise and trading stocks" of the lessors and by the other all of the "accounts and bills receivable," and by the first it contracted to pay "the aggregate value of said merchandise stocks as at the close of business on the said fifteenth day of September, 1922," and by the latter that, upon the expiration of the lease, it would pay over and return to the lessors, or their successors in interest, all cash or other property acquired thereunder, then remaining in its hands after it had been reimbursed for all of the advances and expenditures

it had made. The schedule of the assets received by the Portland Flour Mills Co. from the lessor corporations as prepared by Haskins and Sells shows that, after reimbursing itself for all advances, expenditures and claims of the Portland Flour Mills Co., it had remaining in its hands assets and cash proceeds of the value of more than the amount of plaintiff's claim and now has the same in its possession and unaccounted for. These moneys constitute a trust fund in the hands of the defendant, Portland Flour Mills Co., which under the terms of its contracts should be paid over to the lessors for the payment of their creditors and, if it had been paid over, plaintiff's claim would have been paid. The evidence shows that all other claims against the other lessor corporations, except plaintiff's claim, have been paid and that all the lessor corporations are insolvent and no longer going concerns. While the contracts referred to clearly show the Portland Flour Mills Co. did not intend to obligate itself to pay any liabilities of the lessor corporations other than those set forth in the list of creditors to be prepared by Haskins and Sells, this does not relieve it from the duty which it contracted to perform, to account for and pay over all sums remaining in its hands after it had itself been reimbursed.

Unquestionably, if plaintiff had obtained a judgment against the Pacific Coast Elevator Company in an action at law and had an execution returned unsatisfied, as would have happened if it had taken those steps, it would be entitled, under the showing made in this case, to a decree against the Portland Flour Mills Co. for the amount of its claim and since under the authorities, the corporation being insolvent and not a going concern, and the commencement of a

legal action being wholly unnecessary, it would seem to follow that plaintiff has as much right to a decree as it would have if it were a judgment creditor and not a simple contract creditor of the Pacific Coast Elevator Company and, that being so, it has the unquestionable right to a decree in this suit and this follows whether the contracts referred to were intended primarily for the benefit of the Pacific Coast Elevator Company alone or of that company and its creditors, for in either event plaintiff can enforce the claim because of the insolvency of the debtor corporation.

19. Under this view of the law of the case there are but three other points which need to be noticed. The first is the contention of defendants that the Portland Flour Mills Co. obtained an absolute right to all the mortgaged property through the foreclosure sale and that because thereof, plaintiff can assert no claim or right to have any of the mortgaged property applied in satisfaction of its claim, and the second is that plaintiff, which was the trustee named in the mortgage and plaintiff in the suit, is estopped from denying the title set forth in the mortgage and from disputing the title acquired by the purchaser under the sale. It is wholly unnecessary to consider the question of whether the accounts and bills receivable and the trading stocks of the lessor corporations were subject to the lien of the mortgage, for the parties to the mortgage and the Portland Flour Mills Co., the purchaser under the mortgage foreclosure proceedings, have treated these as entirely separate and distinct from the mortgaged property, and the Portland Flour Mills Co. contracted to account for and pay over to the lessor corporations,

which were also the mortgagor corporations, the proceeds it realized therefrom and it is only as to such proceeds and because of such contract obligations that plaintiff is asking equitable relief. The effect of the decree sought by plaintiff is not to subject any of the mortgaged property to the payment of plaintiff's claim nor to deny to the Portland Flour Mills Co. the title which it had in the mortgaged property, but to compel it to account for the proceeds of other property for which it contracted to account. Under such circumstances, the rule that:

"The mortgagor is estopped from denying the title he has set forth in his mortgage, and all the parties to the foreclosure suit are estopped from disputing the title acquired by the purchaser under the sale,"

as stated in 2 Jones on Mortgages (6 ed.), Section 1654, cited by defendants, is not applicable.

20. The fact that at the time of entering into the contracts to which we have referred neither the Sperry Flour Company nor the Portland Flour Mills Co. had any knowledge or notice of the existence of the Pacific Coast Elevator Company's indebtedness to Houser does not defeat plaintiff's right to collect the debt from the Portland Flour Mills Co. and a decree requiring it to pay such debt is not the making of a new contract between the parties as contended for by defendants. The obligation of the Portland Flour Mills Co. to pay this indebtedness arises from its contract to pay over the proceeds realized from the liquidation of the accounts and bills receivable and from the sale of the merchandise stock, and not because of a specific promise on its part to pay this particular indebtedness.

21-24. Defendants' last contention is that the attempted set-off, which has already been considered, constituted a preference by Houser of one of his creditors over other creditors, which he could lawfully make. At common law an insolvent debtor had the right to prefer one creditor over others and in this state the same rule obtains, provided, of, course, that the giving of such preference is not done in violation of the bankrupt law of the United States, or of some other rule of law. In the case of an insolvent corporation the same rule prevails, provided, of course, that at the time of making the preference the corporation is a going concern and the preference is not one which the law condemns. A preference, however, is the paying or securing to be paid in all or in part of one claim to the exclusion of other claims. In the instant case nothing was paid or secured to be paid and for that reason the attempted set-off could not have amounted to a preference.

After a careful consideration of a long and voluminous record and the many points which were argued and discussed with great learning and ability by counsel, we are of the opinion that the decree of the lower court must be affirmed, and it is so ordered.

Affirmed.   Rehearing Denied.

Coshow and McBride, JJ., concur.