UHLMANN GRAIN CO. v. FIDELITY &
DEPOSIT CO. OF MARYLAND.

No. 7251.

Circuit Court of Appeals, Seventh Circuit.

Nov. 29, 1940.

Rehearing Denied Jan. 2, 1941.

106

Weymouth Kirkland, Howard Ellis, and Wm. H. Symmes, all of Chicago, Ill., for appellant.

Louis L. Dent, George M. Weichelt, John P. Hampton, and Roger D. Doten, all of Chicago, Ill., for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from an order of the District Court entered January 8, 1940, dismissing plaintiff's amended complaint for failure to state a cause of action. Plaintiff's original complaint had theretofore been stricken for the same reason.

The amended complaint (herein referred to as the "complaint") sought a reformation of, and recovery upon, two contracts of insurance, each designated as a Brokers' Blanket Bond, issued by the defendant. It appears from the complaint that plaintiff, a corporation, in 1930 was engaged in the general grain business in Chicago, Illinois, and during that year it caused a partnership to be formed under the name of Uhlmann and Benjamin, to do a brokers' business in stocks. There was no allegation as to the number or names of the persons comprising the partnership other than that contained in a letter [1] dated April 24, 1930, written by Richard Uhlmann, an officer of plaintiff corporation, to Meyer and Engel, Birming-

ham, Alabama, general agents of the defendant, through whom the policies in controversy were issued.

On May 15, 1930, the defendant executed the bonds in suit, one in the amount of $25,000, and the other in the amount of $75,000, in both of which the partnership was named as insured. The premium of the former was $1,161.25 and of the latter, $1,635.75, both of which were paid by the partnership. The bonds were delivered to the partnership. There was no allegation in the complaint as to whether a written application was made for the bonds, but in defendant's motion to dismiss the complaint it was alleged that after the original complaint was dismissed, defendant furnished plaintiff with a copy of the application made by the partnership. It was not alleged that the plaintiff made application for the bonds or paid the premiums, or any part thereof. The plaintiff was not named or mentioned in either of the bonds, and there was no allegation that the partnership ever directed or requested defendant to make the plaintiff an insured or a beneficiary in the bonds, or that the partnership ever intended or assumed that plaintiff should be an insured or beneficiary.

At the time the bonds in suit were delivered to the partnership there was issued by the defendant and delivered to the plaintiff three ordinary fidelity bonds covering plaintiff's three branches at points other than Chicago. After the delivery of the three bonds to plaintiff and the two bonds to the partnership, (those in suit) certain correspondence passed between Richard Uhlmann, representing the plaintiff, and Meyer and Engel, general agents of the defendant. This correspondence was set forth in the complaint, and included plaintiff's letters dated May 24, [2] and May 28, 1930, [3] and a reply by defendant's agents

[1] "Please don't forget to give me the particulars soon about the brokerage bond which we discussed. There is just this phase which I thought best to mention, and that is we formed a subsidiary company which we call Uhlmann and Benjamin, simply because the Stock Exchange rules do not permit corporations to clear stocks. Our offices are all in the same suite, and the same officers who are in the corporation are partners of Uhlmann and Benjamin. I do not imagine there would be any difficulty in having a bond cover Uhlmann Grain Co. as well as Uhlmann & Benjamin. In other words, the grain business is done by the corpora-

tion, and the stock business by the partnership."

[2] "In looking over the policies which you sent us yesterday, call your attention to the fact that on the bonds for Oklahoma City, Amarillo and Ft. Worth, just the Uhlmann Grain Co. was insured, and on the other two policies, Uhlmann and Benjamin. It was my impression that the policies would be made out—Uhlmann Grain Co., and/or Uhlmann and Benjamin. When you get to it please advise me on this subject."

[3] "It does not seem to make so very much difference about Oklahoma City, Amarillo and Ft. Worth. In fact, I

under date of June 24, 1930.[4] Other correspondence had to do with plaintiff's request that its business address be changed, which request was complied with by defendant's agents in the form of riders to be attached to the bonds in question. It was alleged that plaintiff received no further communication from defendant after the letter of June 24, 1930; that it was well known to the defendant that the plaintiff was to be named as an insured; that it was mutually agreed between the plaintiff and the defendant prior to the issuance of the policies that the plaintiff should be so named; that the failure to so name plaintiff was the result either of an intent on the part of the defendant to defraud the plaintiff, or that it, believing the plaintiff was insured, omitted to name the plaintiff as such; and that the plaintiff received no further communication from the defendant after the letter of June 24, 1930, and was led to believe, assume and understand that it was covered by said policies.

It was alleged that plaintiff sustained a loss aggregating $76,683.85 through the fraudulent and wrongful use of its funds by one of its employees between May 15, 1930, and November 12, 1930, and upon discovery of said loss about November 12, 1930, plaintiff notified defendant of the same, but that defendant refused to pay the loss on the ground that plaintiff was not covered by the terms of the policies.

The complaint sets forth a provision in each of said policies to the effect that no action could be maintained unless begun within twelve months after the discovery of the loss. In order to avoid the consequences of these provisions, certain allegations were made. In substance, they were—that at the time the loss was discovered, plaintiff's attorneys and the attorneys for the defendant were one and the same; that a fiduciary relation existed between said attorneys and the plaintiff; that the said attorneys, while acting for and in behalf of plaintiff and defendant, advised them there could be no recovery under said policies because of a certain provision contained therein, referred to as the (f) clause; that

the plaintiff acted upon such advice and was thereby induced not to bring action under said policies until after the expiration of the limitation period; that the statements made by the attorneys in this respect were incorrect; that such action on the part of the defendant estops and precludes it from taking advantage of the provision requiring that suit be brought within one year from the loss; that plaintiff did not know until the month of June, 1939, after the decision of this court in Paddleford v. Fidelity & Casualty Company of New York, 7 Cir., 100 F.2d 606, that it was entitled to indemnification for loss under said policies. It was further alleged that plaintiff again requested defendant to pay, which defendant refused to do about the month of October, 1939.

The prayer for judgment was that the said policies or bonds be reformed and corrected by inserting therein plaintiff's name as an additional insured, and that plaintiff have judgment for the amount of its alleged loss. The primary question for decision is whether plaintiff, under the allegations of its complaint, was entitled to have the policies or bonds reformed and corrected in the manner and to the extent requested. Defendant, in attacking the sufficiency of the complaint, presents three principal contentions, (1) the plaintiff was not a party to the bonds or in privity with the parties named therein, (2) there was a failure to show an agreement between the plaintiff and the defendant that the former was to be insured or covered by the bonds, and (3) the allegations were not sufficient to create an estoppel against the defendant from invoking the limitation period within which suit must be commenced. It is apparent, of course, that if any one of these contentions is valid, the bill was properly dismissed.

Contentions (1) and (2) may appropriately be considered together. It is not asserted by plaintiff—in fact, the complaint is conclusive to the contrary—that plaintiff was named as a party to the bonds, and that so far as appears therefrom, it is

---

think if Uhlmann Grain Co. is covered there, that is all that is necessary, so do not bother about this particular phase. However, I do think on the other two coverages, just where Uhlmann & Benjamin were covered on the policies for $75,000 and $25,000 respectively, that there was to be a carrier 'and/or' Uhlmann Grain Co. However, if the other firm is

included without being specifically named, naturally no harm is done."

4 "Received your letter of June 19th, enclosing letter from Mr. Egan, and in this connection we are writing the Home Office asking if it is necessary to have an endorsement prepared for Uhlmann Grain Company to be attached to the bond of Uhlmann & Benjamin."

a stranger. While the authorities are not entirely harmonious, we are of the opinion from the weight thereof, that a bill to reform a written instrument can be maintained only by a party to the instrument, or one who is in privity thereto. The rule is stated in Bispham's Principles of Equity, 10th Ed., § 468 [5]: "It need scarcely be said (parenthetically), that while equity has and exercises in proper cases the power to reform, it has no power to make a new contract. A Court of Chancery cannot (for example) change an agreement between A. and B., into one between A. and C."

Since it is not necessary as we view it, to come to a definite conclusion in this respect for the reason that if it be assumed that one not a party to a written instrument can maintain a suit to reform, we come to the more important question as to whether there was any agreement between the parties which would authorize such reformation.

In support of its position in this respect, plaintiff must rely largely, if not entirely, upon the correspondence already described. Footnotes 1, 2, 3 and 4. A study of this correspondence is convincing, we think, that no such agreement was made. The most that can be said for it is that it discloses a desire on the part of plaintiff that the bonds cover both it and the partnership, but the circumstances negative any assent in this respect on the part of the defendant. Plaintiff's letter to the defendant of April 24, 1930, (footnote 1) indicates that some conversation had been had between the parties with reference to a brokers' bond. It calls defendant's attention to the fact that a partnership has been formed, and states the purpose and object of the same. It expressed the hope that a bond be issued covering both plaintiff and the partnership.

The policies were delivered about May 15, 1930, in which the partnership alone was named in large-type letters as the insured. That plaintiff had actual notice of this situation is shown by its letter to the defendant of May 24, 1930. (Footnote 2.) Nothing was said in that letter regarding an agreement as to the coverage, but it stated, "it was my impression that the policies would be made out" so as to cover both plaintiff and the partnership. It will be noted that the defendant had also issued to the plaintiff certain other bonds which covered plaintiff's business only. On May 28, 1930, (footnote 3) plaintiff again wrote defendant, in which it expressed the belief that the bonds covered both the plaintiff and the partnership This letter concluded: " * * * However, if the other firm is included (meaning plaintiff) without being specifically named, naturally no harm is done." Again on June 19, 1930, plaintiff wrote the defendant concerning a change of address, and made the inquiry as to whether the bonds should be returned to the defendant for the purpose of having the address changed, and "should we not have riders under the blanket bonds to cover the Uhlmann Grain Company" ? In response to this latter letter, defendant's agents wrote plaintiff to the effect that "we are writing the home office asking if it is necessary to have an endorsement prepared for Uhlmann Grain Company to be attached to the bond of Uhlmann and Benjamin." At the same time, defendant's agents wrote plaintiff that a rider was being prepared changing the address as requested. This rider was delivered to the partnership and attached to the bonds in suit. Again the partnership was designated as the assured. Plaintiff heard nothing further from the defendant or its agents with reference to its request that the coverage include it.

Plaintiff argues that the failure of the defendant to act on its request in this respect amounts to an agreement that the coverage was to be as suggested by plaintiff. We are unable to agree with this argument. It may be true in some instances that silence on the part of a party to whom a proposition or request has been made will give rise to an implied consent so as to constitute an agreement, but we do not think such a rule is applicable here. It is material to note that no such request was made prior to the issuance of the bonds. Defendant was advised "in other words, the grain business is done by the corporation, and the stock business by the partnership." Defendant, no doubt, was led to believe that there were two separate and distinct forms of liability. The bonds, on their face, plainly purported only to insure the partnership. This was for a premium of stated consideration. There was no allegation and no claim that the premium was in an amount greater than that required to furnish protection

---

[5] Cases to the same effect are Swearengin v. Swearengin, Mo.Sup., 202 S.W. 556, 557; Jackson v. Thompson, 166 Tenn. 174, 176, 61 S.W.2d 470; Security Savings & Trust Co. v. Portland Flour Mills Co., 124 Or. 276, 261 P. 432, 440.

for the partnership. Neither is there any allegation that after receipt of the bonds, when plaintiff, by its letters, suggested that the bonds cover both it and the partnership, that there was any offer to pay additional premiums for the extra coverage desired. If there was any doubt in plaintiff's mind that the bonds covered the partnership only, it would seem such doubt would have been dispelled when defendant executed the riders changing the insured's address, wherein the partnership was again named as the insured. The last letter received by the plaintiff from defendant's agents, dated June 24, 1930, upon which it relies, was in no sense an assent to plaintiff's request concerning the coverage. Defendant's agents stated that they were writing the home office, which was a plain indication that they had no authority to give assent. The matter was then apparently dropped by both parties until November 12, 1930, when, after plaintiff had sustained a loss, it made the claim that it was covered by the bonds.

No citation of authority is required to support the proposition that a court of equity is without power to make a new contract under the guise of reformation. It is true, of course, that such courts may reform a contract so that it may conform to the intention of the parties and the agreement made between them. In the present case, the allegations of the complaint being insufficient to disclose that the parties intended, or that there was an agreement, that the bonds should create any rights and liabilities other than those expressed by the terms thereof, it follows that the court was without power to reform the bonds, and that the suit was properly dismissed for this reason.

If there be any doubt in this respect, however, we think the complaint was fatally defective in its allegations by which it sought to create an estoppel against the defendant with reference to the twelve-month limitation provision. As stated, plaintiff's loss was discovered in November, 1930, and the suit was not instituted until October 26, 1939. We have set forth heretofore the substance of the complaint upon which plaintiff relies for an estoppel. It is contended that the same attorneys were acting for each of the parties, and that while so acting, both plaintiff and defendant were advised that no recovery could be had upon the bonds because of the provision referred to as the (f) clause. Plaintiff, so the argument goes, acted and relied upon this advice and had no knowledge or information but that the advice was sound until the case of Paddleford v. Fidelity & Casualty Company of New York, 7 Cir., 100 F.2d 606, was decided by this court. [6]

As a general proposition,[7] in order to constitute an estoppel by conduct, the following elements must be present:

"(1) There must be false representation or wrongful, misleading silence;

"(2) The error must originate in a statement of fact and not in an opinion or statement of law;

"(3) The person claiming the benefits of estoppel must be ignorant of the true facts; and

"(4) Be adversely affected by the acts of the person against whom estoppel is claimed."

We need not discuss these elements separately. After a study of the record and the authorities, we are satisfied that the circumstances do not constitute an estoppel. The allegations of the complaint with reference to the exact position occupied by the attorneys, who, it is claimed, gave the wrongful advice, are rather meager. True, it is stated that they were attorneys for both the plaintiff and the defendant. It does not appear for what purpose the attorneys were employed by plaintiff, if at all, and whether or not they were compensated, or made a charge for their services. Defendant suggests, and we think it is a proper inference, that the attorneys were generally employed by the defendant, and that plaintiff consulted them in such capacity. There is no allegation but that plaintiff knew the attorneys were representing the defendant, or that it was misled in this respect. Now it is claimed that because the attorneys advised both parties there was no liability under clause (f), that

[6] It is contended by plaintiff that clause (f) of the bonds in suit is precisely the same as clause (f) in the bonds before the court in the Paddleford case, wherein we held the insurer liable under the facts of that case. There is no occasion for us to pass upon the validity of this contention.

[7] United States v. S. F. Scott & Sons, 1 Cir., 69 F.2d 728, 732; United States v. Dickinson, 1 Cir., 95 F.2d 65, 68; Central Improvement Company v. Cambria Steel Co., 8 Cir., 210 F. 696, 718.

this amounted to a fraud upon the plaintiff and resulted in the failure of plaintiff to institute its suit for a period of some nine years. That the statement or advice of the attorneys involved purely a question of law is plainly disclosed. Plaintiff, at that time, was just as familiar with the facts pertaining to the situation as was the defendant or its attorneys. As was said in Thompson v. Park Savings Bank, 68 App.D.C. 272, 96 F.2d 544, 549: "Where the parties have equal knowledge or opportunity of knowledge, or where the facts are known equally to both, or both have equal means of ascertaining them, there can be no estoppel. (Citing cases)"

And generally it has been held that the mere statement of an opinion does not operate as an estoppel. As was said in Sturm v. Boker, 150 U.S. 312, 326, 14 S.Ct. 99, 107, 37 L.Ed. 1093: " * * * If he had said, in express terms, that by that contract he was responsible for the loss, it would have been, under the circumstances, only the expression of an opinion as to the law of the contract, and not a declaration or admission of a fact, such as would estop him from subsequently taking a different position as to the true interpretation of the written instrument."

If the advice given, or opinion expressed by the attorneys, had been given by the defendant itself, we doubt if it would be seriously contended it would constitute an estoppel. It would merely have amounted to defendant's denial of liability upon its construction of the legal effect of clause (f). Under the circumstances alleged, it would seem to us that the opinion expressed by defendant's attorneys would have no different effect, nor is there anything to indicate but that their opinion was expressed honestly and in good faith. The mere fact that this court, some eight years later, reached a different conclusion concerning the interpretation of the (f) clause, does not detract from the good faith of the attorneys in question. The fact is, as our opinion in the Paddleford case discloses, that a difficult and close question was presented, and certainly one concerning which lawyers and courts alike might disagree.

We are of the opinion that there was nothing in the situation which could afford justification for plaintiff's long delay in commencing its action. Plaintiff is a business concern, and it is not reasonable to believe that it was so easily led astray. In fact, it would appear that the opinion of

defendant's attorneys as to nonliability would have hastened the commencement of the action rather than delayed it. Especially is this true if plaintiff had knowledge that the attorneys were representing the defendant, and as already stated, we think this is a reasonable inference in the absence of an allegation to the contrary.

We conclude that the complaint failed to state a cause of action. The order of the District Court dismissing it was therefore proper, and is affirmed.