

Geo. T. Arnett, of Idabel, Okl., and W. F. Semple, of Tulsa, Okl., for appellants.

A. Devitt Vanech, Asst. Atty. Gen., Cleon A. Summers, U. S. Atty., of Muskogee, Okl., and John F. Cotter and S. Billingsley Hill, Attys., Department of Justice, both of Washington, D. C., for appellee.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

The United States in its own behalf and for the Choctaw and Chickasaw Tribes of Indians instituted this proceeding to quiet title to and for possession of approximately 800 acres of land which had accreted in and to Section 32, Township 10, S., Range 27 E., in McCurtain County, Oklahoma, extending south to the Oklahoma-Texas border, known as "New Island."

In 1842, the United States granted all lands north of the Red River, in what is now McCurtain County, Oklahoma, to the Choctaw Nation. In 1897, the General Land office surveyed such lands and platted the meander line of the north bank of the Red River as it then ran, as a part of the survey of such lands. At that time, Red River flowed in a loop within Section 32 from south to north and again south, so that Section 32 was only a fractional section north of the River and most of the lots therein were also fractional.

The Secretary of the Interior, through the Commissioner of the Five Civilized Tribes, published a notice offering for sale at public auction at Idabel, Oklahoma, on December 23, 1912, among other tracts of unallotted Indian lands, tract No. 1107 in Section 32. This tract was shown on a plat and was described in terms of lot numbers and acreages. The lots totalled 134.45 acres. The tract, and accordingly most of the lots therein, was bounded on the east and south by the meander line of the north bank of the Red River. The minimum bid received was $739.48. The published notice stated that no bid for any fractional part or subdivision of any tract would be considered and that 25 per cent of the amount bid must be paid at the time of the sale, 25 per cent in one year and 50 per cent in two years from the date of sale, with 6 per cent interest on the deferred installments.

It further provided that all bids would be accepted subject to the approval of the

Secretary of the Interior, and immediately after such approval, a certificate of purchase would be issued, and thereupon the purchaser would be entitled to immediate possession. At the sale, Nicholas A. Shaw and Robert Young bid the minimum price of $739.48 for tract No. 1107 and paid 25 per cent of the bid, $184.90, as required by the notice of sale.

Thereafter, on January 19, 1913, Shaw and Young wrote a letter to the Commissioner of the Five Civilized Tribes in which they referred to tracts Nos. 1105 and 1107 as having been purchased by them at the sale, and stated that each of such tracts had caved into the River considerably since the original survey was made; that tract No. 1105 had caved in over an area of about 40 acres, and tract No. 1107 almost as much. They offered to pay for a survey of the land and asked the Commissioner to advise them what steps should be taken to have the matter adjusted.

It appears from the files of the Superintendent of the Five Civilized Tribes that one Gardenhire made a survey of tract No. 1107 sometime prior to March 8, 1914. There is no showing as to who Gardenhire was, or for what purpose the survey was made. His notes trace a line on the east of the tract which is west of the meander line of the government survey of 1897 on the north and east of it toward the south end. His map shows a calculation of 107.66 acres within the tract, but his notes show 98.66 acres. There was substantial evidence that the Gardenhire line was not a meander line.

Shaw and Young paid interest on the deferred balance in December 1913, 1914, 1915, and 1917. In 1918, they paid a balance of a new purchase price of $592.13 and received a deed approved by the Secretary of the Interior for 107.66 acres. The deed described the property as being that part of t᷈ lots in tract No. 1107 which it defines by metes and bounds. The deed omitted lot 1. The acreage stated in the deed corresponds substantially with the description. The lines of the deed set forth by metes and bounds followed neither the meander line of the 1897 survey nor the Gardenhire survey of 1914. The description contains no mention of the River, the River bank, other topography, or monument, natural or artificial, related to the River. It expressly states that only part of lots 2, 3, 4, 6, and 7 are included in the lands conveyed.

After the 1897 survey and before the Gardenhire survey, the loop of the Red River began to move gradually south until, in 1927, it had reversed itself to become a loop to the south, leaving a large accretion in the form of a peninsula, known as "New Island."

In 1926, the boundary commissioners, appointed by the Supreme Court (see 261 U. S. 340), established the south bank of Red River around this peninsula as the Oklahoma-Texas boundary line. In 1927, during a flood, the River made an avulsive cutoff across the northern part of the accreted peninsula, leaving the land here involved partly north and partly south of the present channel.

The land purchased by Shaw and Young was placed on the tax rolls of McCurtain County in 1919 and remained thereon through 1942. The annual assessments described the land as it is described in the deed to Shaw and Young and listed it as "Parts Lots 2, 3, 4, 6 and 7, 67.66 acres." Shaw and Young failed to pay taxes on the property and in 1933 George Ashford acquired it by a tax deed. Ashford quitclaimed it to T. E. Derryberry in February, 1942. In this instrument there was added to the description the words "and all accretions thereunto belonging." On May 29, 1942, Derryberry conveyed it under the latter description to E. G. Bradham and Ruby Bradham, the defendants below.

The United States relied on the deed of 1918 to Shaw and Young contending that the metes and bounds description of the area conveyed was clear and unambiguous; that the eastern boundary of the deeded land was not the meander line of the River; that the executory agreements resulting from the auction merged in the deed of 1918; and that under the description in the deed of 1918, there remained unconveyed as property of the Indians a strip of land between the eastern boundary of tract No. 1107 and the River, to which unconveyed land New Island had accreted. The Bradhams contended that by the deed of 1918, it

was the intention of the government to convey to Shaw and Young a tract of land riparian to the River and that the accretions belong to such land. They sought reformation of the 1918 deed.

The trial court found the facts as hereinbefore stated and further found that on the date of the deed, there was a strip of land of undeterminable, but recognizable, substantial width, susceptible of ownership, lying south and east of the boundary described in the 1918 deed and concluded that New Island accreted to such strip of land, and that the evidence failed to establish that the United States intended the line in the deed to be a meander line or intended to convey any riparian rights.

From a judgment quieting the title in the Indians and awarding an agreed sum of $250 as damages for unlawful possession since 1943, the Bradhams have appealed.

The language of the deed and the evidence extrinsic thereof support the findings of the trial court.

■ The description in the deed was unambiguous. It did not follow the meander line of the River. It clearly resulted from an adjustment entered into between Shaw and Young and the Secretary of the Interior, by which the amount of land covered by the sale was reduced and the purchase price reduced. The lines described in the deed obviously were to eliminate the caved-in land, not to describe the meander line of the River. The part eliminated was the strip of land lying between the land described in the deed and the River. The terms of the contract of sale were thus modified and the prior contract was merged in the deed.[1] The deed did not convey any riparian rights.

■ The evidence afforded no basis for reformation of the deed. Moreover, a bill to reform a deed cannot be maintained by a person who was neither a party thereto nor in privity with a party thereto.[2]

■ There is no privity between the former owner of land and one who acquired title thereto through a tax sale.[3]

Affirmed.

[1] McGinley v. Martin, 8 Cir., 275 F. 267, 269; Van Ness v. City of Washington, 29 U.S. 232, 284, 285, 4 Pet. 232, 284, 285, 7 L.Ed. 842; Dawson v. Sears, 188 Okl. 544, 110 P.2d 910, 911.

[2] Uhlmann Grain Co. v. Fidelity & Deposit Co., 7 Cir., 116 F.2d 105, 108; Jackson v. Thompson, 166 Tenn. 174, 61 S.W.2d 470, 471; Jackson v. Lucas, 157 Ala. 51, 47 So. 224, 226, 131 Am.St.Rep. 17; Waters v. Massey-Harris Harvester Co., 86 Colo. 98, 278 P. 614, 615; Garlington v. Blount, 146 Ga. 527, 91 S.E. 553; Security Savings & Trust Co. v. Portland Flour Mills Co., 124 Or. 276, 261 P. 432, 440; Reilly v. Martinelli, 131 N.J.Eq. 495, 26 A.2d 152, 154.

[3] Taylor v. Lawrence, 176 Okl. 75, 54 P.2d 634, 638; Hussman v. Durham, 165 U.S. 144, 147, 17 S.Ct. 253, 41 L.Ed. 664.