Submitted on brief February 21, reversed and remanded
May 22, 1957

# SOUTH BEACH LUMBER CORPORATION
## *v.* SWANK
### 311 P. 2d 1018

Leo Levenson, Portland, W. C. Schwenn, Hillsboro, and Harry G. Hoy, Oceanlake, for appellant.

No appearance for respondent.

## ROSSMAN, J.

This is an appeal by the defendant-appellant, Jack Swank, from a decree of the circuit court which (a) ordered the foreclosure of a chattel mortgage, quoted in the complaint, and (b) dismissed the cross-complaint of defendant Jack Swank. The chattels described in the mortgage are a motor truck and a trailer. Specifically, the challenged decree (1) awarded judgment to the plaintiff against the defendant, W. H. Monterey, for $5,500 and an additional sum as an attorney's fee; (2) ordered foreclosure of the plaintiff's mortgage, dated January 12, 1952, as a first lien upon the property; and (3) decreed that "the claim of lien of defendant, Jack Swank, doing business as Jack Swank Pontiac, hereby is declared to be without foundation and therefore denied."

The defendant-cross-plaintiff, who is now the appellant, presents the following assignment of error:

"The court erred in not entering a decree, that the equities were with appellant, reinstating the first mortgage, ordering a sale of the chattels and applying the proceeds thereof in payment of the first mortgage, and that respondent's mortgage was subordinate thereto."

The issues presented by this appeal are clear. June 9, 1950, the aforementioned W. H. Monterey executed and delivered, for a valuable consideration, a chattel mortgage to one Clarence A. Boe, which was later sold and assigned to one A. N. Woods. January 12, 1952, Monterey, for a valuable consideration, executed and delivered to the plaintiff a mortgage upon the same chattels. That mortgage contained this recital:

"This mortgage is given and received as a second mortgage upon the above-described property."

Some time after Woods had acquired title to the chattels he sold them to the defendant-appellant Swank, and two months later satisfied the Boe mortgage for the purpose of clearing Swank's title. The questions are: Did Woods release the first mortgage through mistake? and should the first mortgage be reinstated?

This proceeding was instituted by the plaintiff, South Beach Lumber Corporation, to foreclose the mortgage given January 12, 1952, to it. The mortgage was filed January 23, 1952, with the county clerk of Lincoln county and with the Secretary of State. The complaint alleged that at the time this suit was instituted the note secured by the mortgage was in default and the vehicles were in the possession of Swank. Paragraph VIII of the complaint alleged:

"At the time the above described mortgage was executed and delivered to the Plaintiff, there was a

mortgage on said personal property in favor of Clarence O. Boe securing a promissory note in the sum of Five thousand, three hundred sixteen and 96/100 ($5,316.96) Dollars, on which there remained unpaid at said time One thousand, one hundred and fifty-nine and 39/100 ($1,159.39) Dollars; that since execution and delivery of the note and mortgage dated January 12, 1952 to the plaintiff, the mortgage in favor of Clarence O. Boe has been paid in full and satisfied.''

The complaint prayed for judgment on the note, for a decree that plaintiff's mortgage constituted a first lien on the vehicles, for foreclosure of the mortgage and for other relief.

The answer of the defendant-appellant Swank denied that the plaintiff held a prior lien upon the chattels. It admitted that the mortgage which is described in paragraph VIII of the complaint just quoted was executed and delivered to Boe, but denied that the obligation which it represented had been paid. Swank filed a cross-complaint; it named as defendants the plaintiff, Monterey, Boe and Woods. According to the cross-complaint, the mortgage held by Boe and to which paragraph VIII of the complaint refers, ''constituted a first lien upon the said personal property'' and secured the payment of a balance of $1,232.90 owing by Monterey to Boe. Further, it alleged that on or about July 1, 1952, Boe sold and transferred to Woods all of his ''right, title or interest'' in the vehicles and the chattel mortgage. Concurrently with the sale, transfer and assignment just mentioned, Woods, with the consent of Monterey, so the cross-complaint alleges, went into possession of the vehicles and deemed himself owner of them. Still later, according to the cross-complaint, Swank purchased from Woods ''all of the right,

title or interest, whether as owner or lienor, the said cross-defendant A. N. Woods, then held in the personal property described in plaintiff's complaint.'' At the trial, the cross-complaint was amended to allege that Woods satisfied the first mortgage (Monterey to Boe) inadvertently and through mistake. It further alleged that Woods satisfied the mortgage with the sole intention of giving Swank clear title to the vehicles. The prayer prayed for judgment against Monterey for the unpaid debt and for reinstatement of the mortgage, its foreclosure and other relief.

The evidence indicates that the course of events with which this suit is concerned began when Boe owned the two vehicles and sold them to Monterey. In that transaction Monterey gave Boe a note, dated June 9, 1950, secured by the chattel mortgage to which we have referred as a first mortgage. Its amount, $5,316.96, was payable in twelve monthly installments. Before long, Monterey defaulted in meeting his monthly obligations and, being fearful that Boe would foreclose, appealed to Woods. At that point, Woods, in accordance with Monterey's wishes, purchased the two vehicles and received a bill of sale. At the same time, for a valuable consideration, he received from Boe an assignment of the note and mortgage. Those transactions occurred July 6, 1952, and concurrently with them the two vehicles were delivered to Woods.

While the above events were transpiring, Monterey and the plaintiff were engaged in transactions in lumber, in the course of which the plaintiff extended credit to Monterey. January 12, 1952, the transactions culminated in the signing by Monterey of a promissory note in the denomination of $5,500, payable to the plaintiff upon demand and the chattel mortgage de-

scribed in the complaint which secured payment of the note. The mortgage contained this provision:

"This mortgage is given and received as a second mortgage upon the above-described property.

"The mortgagor hereby covenants that the said described property is free and clear of all encumbrances excepting said first mortgage to Clarence O. Boe, said mortgage being dated June 9, 1950, and given to secure a promissory note in the sum of $5316.96, with interest thereon at 6% per annum. Upon the said note there is a present unpaid balance of $1,159.39."

September 13, 1952, Woods sold the two vehicles to the cross-complainant Swank and gave him a bill of sale as well as a certificate of title. On or before November 28, 1952, Woods inquired of the county clerk of Lincoln county, that being the county in which the vehicles were located, whether any other mortgage which described the vehicles was on record. A search was thereupon conducted and Woods was told that no mortgage except his appeared in the records. Having received that information, Woods, according to his testimony, entered satisfaction of the Monterey-Boe mortgage "so that Mr. Swank would have a better title." He swore that he had no information at that time of the mortgage in favor of the plaintiff. We take the following from his testimony:

"Q   Mr. Woods, state whether or not you would have satisfied the Boe mortgage if you would have known that South Beach had a valid mortgage of record?

"A   No, I wouldn't have."

We quote again from his testimony:

"Q   When you were at the clerk's office, Mr. Woods, at that time you have testified about, you

intended to satisfy the mortgage that was originally given to Mr. Monterey, didn't you?

"A That's right.

"Q Then it was no mistake on your part, you intended to do it?

"A I intended to do that, but I didn't know there was anything against it."

Swank testified that when he purchased the vehicles he had no knowledge of the plaintiff's mortgage. After he had received the bill of sale and the satisfaction of the Boe mortgage had been entered, Swank made repairs and improvements upon the vehicles at an expense of $814.72.

■ Monterey testified that he told both Woods and an agent for Swank of the second mortgage either before or at the time of the transaction between Woods and Swank. The trial judge made no finding as to whether or not Woods or Swank had information of the plaintiff's mortgage. Our reading of the transcript of evidence has persuaded us that Woods released the first mortgage because of a mistake in believing that there was, at the time when he made the release, no other mortgage against the vehicles, and that by releasing his he was thereby clearing title to the vehicles for Swank.

The transaction between Woods and Swank whereby the latter secured title to the vehicles was a trade. Possibly as a part of the transaction, Woods received consideration for the release of the first mortgage, but there is no direct testimony to that effect. It will be recalled that Woods sold the vehicles to Swank September 13, 1952. It was not until November 28, 1952, that he released the mortgage. It is not claimed that he received any consideration at that time.

The trial judge prepared a memorandum opinion from which we quote the following:

"It is the feeling of the Court Swank was charged with constructive notice of the personal property here involved, for two reasons: 1st. He was a dealer in motor vehicles at the time of the purchase and taking possession of said chattels and knew or at least should have known the title as shown on the certificate of title is prima facie evidence of title in certificate holder, subject to any liens noted thereon; also when he disposed of said property he knew or should have known what kind of a title he was passing to the purchaser and had he made inquiry, as any prudent person would, he would have discovered the lien of the second mortgage; 2nd. If he did sell the chattels to a third party in 1953, as he testified the usual and normal transactions of a dealer selling a motor vehicle would be to furnish the purchaser with a certificate of title. Had he done so, certainly he would have been advised through the Secretary of State's office of the lien of the second mortgage.

"Whether Swank should be charged with constructive notice or not, he certainly was informed of the second mortgage on receiving a copy of the summons and complaint on December 17, 1953. In equity and good conscience what then would be his duty, knowing he had purchased and resold, if he had resold, a chattel which was subject to a second mortgage? The answer in the Court's mind would require, 1st: That he immediately contact Woods, if Woods could not or would not discharge the lien of the second mortgage. Then, 2nd: He would contact the second mortgage holder, and if he found he only purchased a first mortgage instead of an encumbered title, he would 3rd: Immediately contact the original mortgagor and if he could not effect a satisfactory adjustment of all interests in the chattels, he would then proceed upon a foreclosure of the first mortgage. In any event, equity would require Swank to deal with said chattels,

after notice of the second lien, in such a manner as would not tend to destroy or materially lessen the value of the second mortgage holder's lien.

"From the foregoing summary of events, it is the opinion of the Court that defendant Swank has not done equity and therefore is not entitled to the relief of equity."

The record contains nothing which suggests that the plaintiff's rights will be unfairly affected if the Monterey-Boe mortgage is reinstated. The mortgage which it holds and seeks to foreclose recited: "This mortgage is * * * received as a second mortgage." Such will be the actual state of affairs if the Monterey-Boe mortgage is reinstated. It is true that the evidence indicates that the truck has declined in value materially, but its lessened value is due to age and market.

It is clear that when Woods released the mortgage which Monterey had executed, he did so in order to clear Swank's title to the chattels and not for the purpose of improving the status of the plaintiff's mortgage of which he says he had no information. If the decree entered by the circuit court is sustained, Woods' purpose will be defeated. In that event, Swank, instead of having clear title, will find that the plaintiff's mortgage is a threat to his title. Likewise, the plaintiff, which had nothing but a second mortgage when the instrument was executed, will have a first mortgage if the challenged decree is sustained.

The above will suffice as a review of the evidence.

■ In *Pearce v. Buell,* 22 Or 29, 29 P 78, Mr. Justice ROBERT BEAN declared:

"The fact that the mortgage was released in ignorance of the existence of the intervening lien, is in equity deemed such a mistake of fact as to

entitle the party to relief, although such lien may have been of record.''

The decision also said:

"* * * No rule of law is better settled than if the holder of a mortgage take a new mortgage as a substitute for a former one, and cancel and release the latter in ignorance of the existence of an intervening lien upon the mortgaged premises, although such lien be of record, equity will, in the absence of the intervening rights of third parties, restore the lien of the first mortgage and give it its original priority.''

We take the following from *Chase v. McKenzie*, 81 Or 429, 159 P 1025:

"* * * the rule is settled in Oregon that, when the holder of a realty mortgage cancels it in ignorance of the existence of an intermediate lien upon the premises, though the charge thus imposed upon the land is of record, a court of equity in a suit instituted for that purpose, will, in the absence of intervening rights, restore the original lien and give it priority: * * *.''

The language just quoted was reiterated and applied in *Holzmeyer v. Van Doren*, 172 Or 176, 139 P2d 778:

■ It has been noticed that when Woods obtained a bill of sale to the chattels from Monterey, he also secured from Boe an assignment of the chattel mortgage which Monterey had given to Boe (first mortgage). Thus, Woods was both grantee and assignee of the encumbering mortgage. In *Katz v. Obenchain*, 48 Or 352, 85 P 617, in which an analogous situation confronted the court, the opinion, written by Chief Justice ROBERT BEAN, said:

"* * * Mergers are not favored in equity. When a lesser and a higher estate meet and coincide

in the same person they will be kept separate when equity and justice require it, unless there is an expressed intention to the contrary. * * * It is consequently said by Mr. Pomeroy that 'where a mortgagee takes a conveyance of the land from the mortgagor or from the grantee of the mortgagor, if the transaction is fair, the presumption of an intention to keep the security alive is very strong. It is generally for the interests of the party in this position that the mortgage should not merge, but should be preserved to retain a priority over other encumbrances. As the mortgagee acquiring the land is not the debtor party bound to pay off either the mortgage or the other encumbrances on the land, there is nothing to prevent equity from carrying out his presumed intent, by decreeing against a merger.': * * *.''

■ We revert to the statement previously made that the evidence contains no intimation that the plaintiff's rights will be unfairly impressed if the Monterey-Boe mortgage is reinstated. The plaintiff was aware of that mortgage when it accepted its own, and did nothing whatever to bring about its release. Nor does the plaintiff claim that it changed its position in reliance upon the release. In fact, if it heard of the release before it filed this suit, the single witness whom it called to the witness stand did not mention it. The release of the first mortgage, if it cannot be undone, will represent for the plaintiff manna, not from heaven, but from the pocketbook of plaintiff's adversaries. Since the cross-plaintiff Swank spent $814.72 for repairs and improvements after acquiring title to the vehicles, the plaintiff will have the advantage of a first lien upon those betterments unless the Monterey-Boe mortgage is reinstated. It is clear that in this instance merger of the lien created by the Monterey-Boe mortgage and the title granted by the Woods-Monterey bill

of sale should not be favored. To the contrary, equity and justice require that the separate interests of mortgagee and grantee should be kept apart from each other.

■ If Woods were the cross-plaintiff, it is clear that he would be entitled to have the Monterey-Boe mortgage reinstated. Its reinstatement would merely withhold from the plaintiff a stroke of luck to which it is not entitled. Since cross-plaintiff Swank, as Woods' successor, was in privity with the latter, he is entitled to the rights which Woods possessed and which he sought to exercise in the cross-plaintiff's favor. *Security Savings & Trust Co. v. Portland Flour Mills Co.,* 124 Or 276, 261 P 432.

It follows that the circuit court should have entered a decree in harmony with the prayer of the cross-complaint. It will be remanded for that purpose.

Reversed and remanded.